## UNITED STATES v. MACK.
### No. 307.

Circuit Court of Appeals, Second Circuit.
June 3, 1940.

John S. McGovern and Michael J. Maher, both of Buffalo, N. Y., for appellant.

George L. Grobe, U. S. Atty., of Buffalo, N. Y. (R. Norman Kirchgraber, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

■ This is an appeal from a conviction for a conspiracy between the accused, Mack, and twelve other persons to commit three crimes: (1) to harbor and conceal aliens, not entitled to reside in the United States (§ 144, Title 8 U. S. Code, 8 U.S.C.A. § 144); (2) to keep and support aliens as prostitutes without registering them (§ 402(2), Title 18 U.S.Code, 18 U.S.C.A. § 402(2); (3) to transport prostitutes in foreign commerce (§ 398, Title 18 U. S. Code, 18 U.S.C.A. § 398). The only question deserving discussion is whether there was enough evidence to support the verdict. Mack was shown to have been the keeper of a brothel in Niagara Falls, N. Y., where for a short time she maintained a Canadian woman, named Garrie, as an inmate. While Garrie was there, the police raided the house, and she was hid by Kelly, her paramour, "in the maid's house at the back" for a few hours, after which she "went back" to the house, and Mack "let me go Sunday", (it did not appear on what day the raid had taken place) giving as her reason that "there were too many raids, and I was a Canadian". There is nothing in the record to show when Mack learned this, or that she kept Garrie after she had. It did appear that Garrie and several other Canadian women had been passed about from one house to another, apparently making only short stops in each, and that they had told the keepers of their alienage. Garrie's testimony as to the raid itself was extremely confused; she had apparently also been in an earlier raid, while living in the house of a woman, named Siefert. Garrie said that Mack was present at that time, though it is doubtful whether she meant it. In any case it is impossible to disentangle a consistent story from her testimony beyond what we have already stated, and no jury would have been justified on this record in finding that Mack had learned of Garrie's alienage earlier than we have said. Several other inmates of the houses kept by the conspirators were Canadians, and the keepers had a certain amount of communication with Mack, but this also did not justify the assumption that the knowledge as to Garrie's alienage had in fact reached her.

■ The objection is not good that the crime must be proved as laid in the indictment; it was enough to prove a conspiracy to commit any single one of the crimes charged, for the variance would not be material. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. The first of the three, "harboring" an alien, was certainly not proved, for there can be no doubt that here knowledge of the alienage is an element. It would be shocking to hold guilty anyone who gave shelter to an alien whom he supposed to be a citizen; and besides, the statute is very plainly directed against those who abet evaders of the law against unlawful entry, as the collocation of "conceal" and "harbor" shows. Indeed, the word, "harbor" alone often connotes surreptitious concealment. Since the prosecution failed to show that Mack kept Garrie after she had learned that she was an alien, this part of the conspiracy fell. The case for transportation in foreign commerce was even weaker, for there is no suggestion that Mack had the slightest acquaintance with Garrie's original entry, or with her several later returns to Canada and reëntries into the United States.

■ Thus there remained only the crime of failing to register Garrie as a prostitute within thirty days after she became an inmate of the house. Section 402 (2) is part of the "White Slave Traffic Act", (§§ 397–404 of Title 18 U.S.Code, 18 U.S.C.A. §§ 397–404) which itself was designed to implement an international effort to prevent the transportation of prostitutes from one country to another. The section

as a whole provided, that the keepers of all such houses should register alien inmates with the Commissioner-General of Immigration, and that if they did, they should be immune from prosecution by the United States for anything so reported. Subdivision two of the section made it a crime not to register the prostitute, and the first question is whether scienter was a necessary element of the crime. The "statement" required must contain "the name of such alien woman or girl, the place at which she is kept, and all facts as to the date of her entry into the United States, the port through which she entered, her age, nationality, and parentage, and concerning her procuration to come to this country within the knowledge of such person"; that is, the keeper. As to much of the content of the prescribed statement the statute does indeed expressly make scienter a condition, but it does not follow that one who receives a prostitute, is not put at his peril to learn whether she is an alien. We think that he is. Traffic in prostitutes gravely offends current moral standards, and is by local law contraband in most places, as it is in New York (Penal Law, Consol.Laws, c. 40, §§ 1146, 2460). There is thus no injustice in imposing this added peril to the business; moreover, § 402 is clearly in the nature of a police regulation, as to which scienter is often unnecessary. United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604. The keeping of such a house is a crime in Connecticut without scienter, State v. Gaetano, 96 Conn. 306, 114 A. 82, 15 A.L.R. 458; and it is well settled in cases of rape that ignorance that the prosecutrix is below the age of consent is no excuse. Commonwealth v. Murphy, 165 Mass. 66, 42 N.E. 504, 30 L.R.A. 734, 52 Am.St. Rep. 496; People v. Marks, 146 App.Div. 11, 130 N.Y.S. 524; People v. Gengels, 218 Mich. 632, 188 N.W. 398. Indeed, the doctrine has been carried to most unjustified lengths in the case of bigamy, following Commonwealth v. Mash, 7 Metc. Mass., 472. These are all cases of grave sexual delinquencies like the case at bar; and there are hosts of similar decisions in prosecutions for the violation of ordinances and the like which are designed to govern details of conduct which must be controlled in large scale, and where usually the penalties are light.[1] The doctrine of the common-law that a man should not be convicted for what he brought to pass unwit-

tingly, did, and still does, usually conform with our sense of justice; though, even so, he is chargeable at his peril with knowledge that the proscribed conduct is unlawful, There are situations in which he acts at his peril both as to that and as to some of the facts, and it seems to us that this is one. That no doubt depends upon a balance of opposing considerations, but here, as we said, not only was the registration of prostitutes (at least in form, whatever may have been its real purpose) a policing measure, but it concerned an activity, generally outlawed, the imposition upon the conduct of which of an added risk need raise no compunctions. We hold therefore that a person entertaining an alien prostitute is liable under § 402(2), Title 18 U.S. Code, 18 U.S.C.A. § 402(2), regardless of his knowledge that she is an alien.

It is another question whether the accused at bar was guilty of conspiracy to commit that offence. Starting with People v. Powell, 63 N.Y. 88, the anomalous doctrine has indeed gained some footing in the circuit courts of appeals that for conspiracy there must be a "corrupt motive". Hamburg-American Steam Packet Company v. United States, 2 Cir., 250 F. 747, 758, 759; Landen v. United States, 6 Cir., 299 F. 75, 78, 79; Cruz v. United States, 10 Cir., 106 F.2d 828, 830. Yet it is hard to see any reason for this, or why more proof should be necessary than that the parties had in contemplation all the elements of the crime they are charged with conspiracy to commit. Chadwick v. United States, 6 Cir., 141 F. 225, 243. Be that as it may, there was in this case "corrupt motive" in abundance, and the only possible doubt is whether there was a conspiracy not to register. The only persons who could have been parties to this with Mack were Kelly and Garrie herself. Neither of these, nor Mack, is shown to have known that any statement was prescribed by law, and it was no part at least of their express understanding that Mack should not file one. It is true that one should distinguish between a conspiracy in which the agreed performance merely does not include an act which one or more of the parties are legally bound to perform, and one in which they agree that the act shall not be performed; conspiracy is an affirmative act, measured by the mutual understanding of the participants. But, as is perhaps too often repeated, its terms are seldom, if

---

[1] Public Welfare Offenses, Francis B. Sayre, 33 Col.L.Rev. 55 (1933).

ever, express, and it must almost always be gathered by implication from conduct; and, as in the case of all agreements, its borders are to be determined with an eye to its purpose. A jury might, and indeed would almost surely, find that all three concerned in Garrie's stay in Mack's house understood that Mack should not advise the federal authorities, from whom the only real danger of interruption came. The whole affair was surreptitious, and liable to disaster upon discovery, and they were the most dreaded enemies. That implied condition covered any form of disclosure, of which the statement required by § 402(1), Title 18 U.S.Code, 18 U.S.C.A. § 402(1), would have been perhaps the most telling. In spite, therefore, of the absence of any notice of Garrie's alienage we think that the crime was proved.

Judgment affirmed.