**UNITED STATES of America, Appellee,**

v.

**Martin FRANK, Appellant.**

**No. 1122, Docket 74–2639.**

United States Court of Appeals, Second Circuit.

Argued May 15, 1975.

Decided June 27, 1975.

Certiorari Denied Jan. 26, 1976. See 96 S.Ct. 878.

Irving Anolik, New York City, for appellant.

Ira Lee Sorkin, Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., S.D.N.Y., John P. Flannery, Jr., Lawrence S. Feld, Asst. U. S. Attys., of counsel), for appellee.

Before SMITH and OAKES, Circuit Judges, and JAMESON, District Judge.*

OAKES, Circuit Judge:

The "Go-Go" stock market of the late 1960's produced a wide variety of stock frauds reminiscent of the pre-SEC 1920's, with one of the more common schemes involving market price manipulation upon a company's "going public." The stock, preferably one with a salable or "glamorous" name, would originally be issued to insiders, with only a limited number of shares issued (a "thin float"). The price of the stock would then be manipulated by trading back and forth among the insiders, with the limited number of shares available for trading making it reasonably easy to control the market. Additional pressure might then be exerted upon the market by touting the stock in market newsletters and by approaching "friendly" brokers with favorable reports about the company. Ultimately the insiders would sell their initial investment, plus what they purchased in the "after market," at big profits to an unsuspecting public or to individual dupes who were left holding worthless paper when the bubble burst and the stock leveled out at a true value.

This appeal, involving just such a factual setting, is by Martin Frank, a lawyer specializing in SEC matters, from a conviction by a jury in the United States District Court for the Southern District of New York, Harold R. Tyler, Jr.,

* Of the District of Montana, sitting by designation.

*Judge,* for having conspired, 18 U.S.C. § 371, to violate the federal securities laws in connection with the initial public offering of Training with the Pros (TWP).[1] His coconspirators included two New York stock manipulators, Stoller and Allen, who were "financial consultants" and ran a market "survey," and one Herbert, an employee of the Swiss Bank Hofmann. That bank apparently lent itself to manipulations, not only by supplying the usual "numbered" anonymous or code-name accounts the secrecy of which was safeguarded under Swiss law, but also by buying and selling speculative American stocks for its own and its customers' accounts. Appellant's services to the conspiracy were essentially in his capacity as a lawyer, giving advice to the conspirators (who also included the ubiquitously criminal Ramon D'Onofrio)[2] as to how best to conceal their TWP manipulation and how best to avoid, first, SEC investigation and, second, after investigation commenced, SEC uncovering of that illegal manipulation. These services were for a consideration of $15,000 cash (paid into Frank's own "Erika" account at Bank Hofmann) and 1,000 shares of TWP also to be there deposited.

Coconspirator Allen pleaded guilty to the conspiracy count (along with some other indictments) and was called as a defense witness, of which more later. D'Onofrio, when he finally traded his fugitive status in 1973 for certain prosecution protection, testified for the prosecution as has become his wont, note 2 *supra.* Stoller was convicted on all 12 counts that went to the jury, four false statement counts against him having been dismissed at the close of the Government's case. Appellant was acquitted on nine substantive counts, es-

sentially relating to fraud in the offer and sale and in the purchase and sale of securities and mail fraud. For his conviction on the conspiracy count, however, he received a two-year jail sentence and $2,500 fine. We affirm.

With the exception of the Swiss bank participation in the scheme and evidence of assorted threats to lives of certain participants or dupes when the scheme began to fall apart apparently as the result of an anonymous letter to the SEC, the tawdry facts are so typical of crookedness over-the-counter that they are unnecessary to detail here, at least where appellant contests sufficiency of the evidence, if at all, only en passant. There is in any event no substance to a sufficiency argument.

In February or March of 1968, D'Onofrio, Stoller, Allen and Joseph Pfingst met in Zurich, Switzerland, and agreed to a scheme whereby they would help to underwrite an offering of 40,000 to 50,000 shares in TWP. Under the plan, the coconspirators were to receive 25,000 shares on the date of the offering for $6–$7 per share. They would then manipulate the stock price to $50–$60 a share at which point they would "blow off" or sell the shares to Stoller and Allen's customers, Bonavia and Weissinger, who had accounts at Bank Hofmann that were controlled by Stoller. It was further agreed initially that Herbert, a Bank Hofmann employee, would have the bank send an "indication letter" to TWP expressing a willingness to purchase 25,000 shares of stock on the offering date.

It was at this point that appellant Frank became involved in this conspiracy. D'Onofrio's lawyer-partner Joseph Pfingst[3] had drafted an "indication letter" which stupidly[4] carried a date prior

---

1. Training with the Pros (formerly M & H Studios, Inc.) was a small company engaged in the business of promoting sales training programs.

2. *United States* v. *Pfingst,* 490 F.2d 262 (2d Cir. 1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); *United States* v. *Pfingst,* 477 F.2d 177, 191–92 (2d Cir.), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d

400 (1973). *See United States v. Persky,* 520 F.2d 283, 285 (2d Cir. 1975).

3. *See* note 2 *supra.* Pfingst apparently left the TWP deal when he became a state judge.

4. Pfingst and D'Onofrio were following the pattern of an earlier "deal," but one in which the issue was already public.

to the filing of the Regulation A notification for TWP, *i.e.,* prior to TWP's signifying any intention of going public. Reviewing this letter Frank immediately recognized that legally no one could "indicate" for an issue as to which the company had not yet filed its SEC notification. He thereby took control of the legal aspects of the scheme explaining to his coconspirators "how to do the deal without getting caught."

His explanation included taking only 15,000 shares, so as not to alert the SEC, using friendly nominees (guaranteed a small profit) at 1,000 shares each as vehicles to take that 15,000, obtaining a bill of sale verifying a sale to Bank Hofmann, and drawing checks on a New York bank showing a profit for federal tax purposes. Subsequently Frank gave more advice to the conspirators to throw the SEC off the scent, *i. e.,* to have more than 100 people own stock in TWP with some of them unfamiliar with the three key conspirators. He also helped with the mechanics, assembling the nominees' certificates, obtaining bills of sale from the nominees, guaranteeing signatures, and preparing and notarizing some of the bills of sale so as to ease transfer of the stock from the nominees into the "street name" of a brokerage house which handled Bank Hofmann's American accounts, thereby facilitating the "blowoff" to Stoller and Allen's two clients' accounts at that pillar of a Swiss bank. When the SEC began to pursue the TWP trial, Frank told D'Onofrio to talk to his friend Moss, the president of TWP, to make sure that Frank's firm would represent TWP "so I can protect us." In connection with an SEC investigation, Frank told Stoller, who thought he could fool "those dumb bastards at the SEC," that he should have taken the Fifth Amendment rather than to have testified perjuriously. Frank also told Bonavia, Stoller's "client" who had been

unwittingly stuck with 9,100 of the conspirators' shares of TWP at the "blowoff" price of $450,000, that he should "take the Fifth," "not to involve us in any Swiss bank accounts," and not to mention TWP, and Bonavia complied.[5] Frank wanted to be sure to "get stock this time," especially if it were "going to be a hot number." When considerable time had passed—the events above occurred in 1968 and 1969 and by late 1972 or early 1973 Frank still had not received his 1,000 shares—he went to Switzerland and complained to Stoller and Herbert, threatening the latter's bank with "a hell of a lot of problems from me." Frank, in short, was no mere "casual facilitator," *United States* v. *Hysohion,* 448 F.2d 343, 347 (2d Cir. 1971), but gave advice and performed acts knowing that they would be used to violate the federal securities laws. *See United States* v. *Tramunti,* 513 F.2d 1087, 1109 (2d Cir. 1975).

▮▮ His argument that his acquittal on the substantive counts precludes conviction on the conspiracy count carries no impact either as a contention of inconsistency of verdict, *Dunn* v. *United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932); *United States* v. *Zane,* 495 F.2d 683, 690 (2d Cir.), *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), or as a violation of Wharton's "rule," the doctrine (now applicable only as a judicial presumption) that when there is no ingredient in the conspiracy which is not present in the substantive crime, *Pinkerton* v. *United States,* 328 U.S. 640, 643, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), as in the case of bribery, *United States* v. *Sager,* 49 F.2d 725 (2d Cir. 1931), there can be no conviction for conspiracy. *United States* v. *Zeuli,* 137 F.2d 845 (2d Cir. 1943). Here, of course, the conspiracy involved more persons than were required for the commission

5. Bonavia was somewhat vulnerable to Stoller's and Frank's importunations as his own past dealings at Bank Hofmann with Stoller had left him so. Stoller also threatened Bonavia that D'Onofrio would "have him taken care of."

of any of the substantive offenses. *Ianelli* v. *United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States* v. *Fino*, 478 F.2d 35, 38 (2d Cir. 1973), *cert. denied*, 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974); *United States* v. *Benter*, 457 F.2d 1174, 1178 (2d Cir.), *cert. denied*, 409 U.S. 842, 93 S.Ct. 41, 34 L.Ed.2d 82 (1972).

Appellant's principal point is that the Government infringed his Sixth Amendment rights to counsel as explicated in *Massiah* v. *United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), by inducing the then cooperating defendant Allen to tape conversations with Frank, who had been attempting to have Allen sign an affidavit exonerating him and denying payment of $15,000 to Frank in connection with the TWP stock deal. While the Government's action was taken after the first indictment had been filed in this case, 74 Cr. 159, Allen was directed to limit his conversation to matters involving perjury and obstruction of justice—matters which eventually led to the filing of a superseding indictment, 74 Cr. 763. While the tapes might possibly have been admitted solely with respect to the charges in that subsequent indictment, *cf. Hoffa* v. *United States*, 385 U.S. 293, 309–10, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *United States* v. *Poeta*, 455 F.2d 117, 122 (2d Cir.), *cert. denied*, 406 U.S. 948, 92 S.Ct. 2041, 32 L.Ed.2d 337 (1972), Judge Tyler, ruling safely, *excluded* the tapes because one of them "drips with culpability" on the part of Frank on the main charge here under consideration.[6] Indefatigably, Frank claims, however, that he was prevented

from taking the stand on his own behalf, because he knew the tapes could be used against him for impeachment purposes under *Harris* v. *New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). This point is not timely since it was first raised in a Rule 29 motion after trial, but, more importantly, as *Harris* holds, in a *Miranda* context to be sure, a person cannot affirmatively resort to perjurious testimony and avoid impeachment by evidence however obtained. The *Massiah* context here, at least in the light of the Government's good faith effort not to violate appellant's Sixth Amendment rights, does not differentiate this case. We cannot feel overly sympathetic to the novel argument that a defendant was prevented from furnishing perjurious testimony by the existence of this evidence in Government hands.

Frank's next major contention deserves no more than summary treatment. When Allen was called as a witness after the tapes were made, it was as a witness for Stoller. Allen then proceeded, after denying most of the prosecution's evidence in chief, to perjure himself at some length by testifying that Frank had not been paid $15,000 for telling the conspirators how to run the TWP deal,[7] but rather—as Frank had attempted to have him say—that Allen was paying back a loan to an Al Brodkin. Confronted with a transcript of the lie-giving tapes, Allen then decided to exercise his Fifth Amendment rights. Judge Tyler properly ruled that all of Allen's testimony regarding Frank be stricken, to protect the court itself against fraud—explained to the jury as for "technical reasons." The only viable alternative for

---

6. The indictment for suborning perjury and obstructing justice had been consolidated for trial with that in the instant trial but when the tapes were excluded was dismissed at the close of the Government's case. The phrase "drips wih culpability," it can be said, now that Judge Tyler has left the bench for other work, is what is typically called at Foley Square a "Tyler-ism," which is a colorfully pungent, all-too-accurate avoidance of euphemism.

7. Frank himself had said on the tape (GX 101B): "There's no question in my mind, and I know there is none in yours, that you paid me $15,000 for telling you how to do the training deal. There is no question in my mind. I had to tell you and Ray and Jerry [Frank meant Stoller, "Phil"]."

**1292**

the court was to permit cross-examination by the Government on the basis of the theretofore inadmissible tapes. In the light of the *Massiah* claim and the fact that Allen was called as Stoller's and not Frank's witness, permitting such cross-examination would have carried substantial mistrial risks.

■■ We need not rest on the trial court's ground for striking the Allen testimony, although the powers of a court to prevent intrinsic fraud on it are very great indeed. *Cf. Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944). *See Tehan v. Shott*, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966) ("the basic purpose of a trial is the determination of truth"). Rather, by virtue of Allen's refusing to answer (for whatever reason) proper, relevant questions on cross-examination going directly to the heart of his testimony on direct examination, the direct testimony became hearsay, since not subject to cross-examination, and was therefore properly struck. *Cf. United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir.), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963); 5 Wigmore on Evidence § 1362 and § 1391 (1972 pocket supp.) at 29. *See also Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968).[8] In this situation the Government is surely entitled to the protection of the same rule against admissibility of non-collateral testimony not subject to cross-examination as is a defendant.

■ Frank also argues that his rights to a fair trial under the Fifth and Sixth Amendments were prejudiced by the

four-year eight-month delay between the end of the conspiracy (June, 1969) and indictment (February 1, 1974). But factually, the key testimony of D'Onofrio was not available to the Government until his waiver of extradition from England in May, 1973,[9] and, legally, we are bound by *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), since here there was neither prosecutorial misconduct nor actual prejudice. *See United States v. Brown*, 511 F.2d 920, 922–923 (2d Cir. 1975). On the question of prejudice, while Moss, the president of TWP, died on July 2, 1974, Frank was aware of his illness and could have deposed him, Fed.R.Crim.P. 15 and 18 U.S.C. § 3503. *United States v. Schwartz*, 464 F.2d 499, 505 (2d Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). And Frank was not pressing for trial. *United States v. Stein*, 456 F.2d 844, 849–50 (2d Cir.), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972).

■ Frank makes essentially the same claim previously made by Pfingst, *United States v. Pfingst*, 490 F.2d at 262, that the Government probably suppressed § 3500 material regarding D'Onofrio. He made no such claim at trial, did not cross-examine D'Onofrio about it and fails to call our attention to any of that material not disclosed in the 33 documents delivered to counsel at trial or in the *Pfingst* records, note 2 *supra*. We have examined in camera the D'Onofrio sentencing memoranda given Judge Brieant and see no Jencks Act or *Brady* material (*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)) not already disclosed to appellant.

---

8. We need express no opinion on whether by testifying in direct Allen waived his Fifth Amendment privilege, *Brown v. United States*, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), or on what would have been the situation if the direct testimony had been on a collateral matter.

9. While D'Onofrio had earlier cooperated with the Government to testify against Pfingst, note

2 *supra*, when questioned in Pfingst's bribery trial about his bank account, "Egypt," involved in the TWP fraud, he invoked his Fifth Amendment privilege, spent 22 days in jail for contempt, was fined $10,000 and became a fugitive. *United States v. Pfingst*, 490 F.2d at 269.

■ Appellant's only other point worthy of discussion is that the Government summation and the court's charge prejudicially altered the Government's theory of the case. Frank argues that he was surprised by the Government's claim under Count Two [10] that the conspirators had omitted material facts, especially that they were underwriters, while they had defended against a charge of improper manipulation. Even were this so (and nothing in Count Two indicates it to be), Frank was acquitted on that count and the conspiracy count covered three objects, fraud in the offer and sale of TWP stock (Count Two), fraud in the purchase and sale (Counts Three-Six), and use of the mails to defraud. Evidence of accomplishment of one of the objectives of a conspiracy is enough to support the conspiracy conviction. *United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir. 1975); *United States v. Mack*, 112 F.2d 290, 291 (2d Cir. 1940).

Appellant's remaining claims as to the court's charge, the denial of a severance of counts relating to Stoller's false statements to the SEC (*cf. United States v. Carson*, 464 F.2d 424, 436 (2d Cir.), *cert. denied*, 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972)), and as to jurisdiction are in the first two instances without merit and in the last one frivolous.

Judgment affirmed.

10. A count charging a violation of Section 17 of the Securities Act, 15 U.S.C. § 77q:

    (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

    (1) to employ any device, scheme, or artifice to defraud, or

    (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

    (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.