UNITED STATES of America,
Appellee,

v.

**Jay COHEN, Defendant Appellant.**

**Docket No. 00–1574.**

United States Court of Appeals,
Second Circuit.

Argued: May 21, 2001.

Decided: July 31, 2001.

Joseph V. DeMarco, Assistant United States Attorney for Mary Jo White, United States Attorney for the Southern District of New York (Assistant United States Attorney George S. Canellos, New York, NY, on the brief), for Appellee.

Mark M. Baker, New York, N.Y. (Brafman & Ross, P.C., Benjamin Brafman, Jennifer Liang, and Melinda Sarafa on the brief) for Defendant–Appellant.

Before: LEVAL and PARKER, Circuit Judges, and KEENAN,* District Judge.

KEENAN, District Judge:

### BACKGROUND

In 1996, the Defendant, Jay Cohen ("Cohen") was young, bright, and enjoyed a lucrative position at Group One, a San Francisco firm that traded in options and derivatives. That was not all to last, for by 1996 the Internet revolution was in the speed lane. Inspired by the new technology and its potential, Cohen decided to pursue the dream of owning his own e-business. By year's end he had left his job at Group One, moved to the Caribbean island of Antigua, and had become a bookmaker.

Cohen, as President, and his partners, all American citizens, dubbed their new venture the World Sports Exchange ("WSE"). WSE's sole business involved bookmaking on American sports events, and was purportedly patterned after New York's Off–Track Betting Corporation.[2] WSE targeted customers in the United States, advertising its business throughout America by radio, newspaper, and television. Its advertisements invited customers to bet with WSE either by toll-free telephone or by internet.

WSE operated an "account-wagering" system. It required that its new customers first open an account with WSE and wire at least $300 into that account in Antigua. A customer seeking to bet would then contact WSE either by telephone or internet to request a particular bet. WSE would issue an immediate, automatic acceptance and confirmation of that bet, and would maintain the bet from that customer's account.

In one fifteen-month period, WSE collected approximately $5.3 million in funds wired from customers in the United States. In addition, WSE would typically retain a "vig" or commission of 10% on each bet. Cohen boasted that in its first year of operation, WSE had already attracted nearly 1,600 customers. By November 1998, WSE had received 60,000 phone calls from customers in the United

---

* The Honorable John F. Keenan, United States District Judge for the Southern District of New York, sitting by designation.

2. We note, however, that the Off–Track Betting Corporation's business is limited to taking bets on horseracing, not other sporting events.

States, including over 6,100 from New York.

In the course of an FBI investigation of offshore bookmakers, FBI agents in New York contacted WSE by telephone and internet numerous times between October 1997 and March 1998 to open accounts and place bets. Cohen was arrested in March 1998 under an eight-count indictment charging him with conspiracy and substantive offenses in violation of 18 U.S.C. § 1084 ("§ 1084"). That statute reads as follows:

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both. (b) Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

See § 1084(a)-(b). In the conspiracy count (Count One) and in five of the seven substantive counts (Counts Three through Six, and Eight), Cohen was charged with violating all three prohibitive clauses of § 1084(a) ((1) transmission in interstate or foreign commerce of bets or wagers, (2) transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, (3) information assisting in the placement of bets or wagers). In two counts, Counts Two and Seven, he was charged only with transmitting "information assisting in the placing of bets or wagers."

Cohen was convicted on all eight counts on February 28, 2000 after a ten-day jury trial before Judge Thomas P. Griesa. The jury found in special interrogatories that Cohen had violated all three prohibitive clauses of § 1084(a) with respect to the five counts in which those violations were charged. Judge Griesa sentenced Cohen on August 10, 2000 to a term of twenty-one months' imprisonment. He has remained on bail pending the outcome of this appeal.

### DISCUSSION

On appeal, Cohen asks this Court to consider the following six issues: (1) whether the Government was required to prove a "corrupt motive" in connection with the conspiracy in this case; (2) whether the district court properly instructed the jury to disregard the safe-harbor provision contained in § 1084(b); (3) whether Cohen "knowingly" violated § 1084; (4) whether the rule of lenity requires a reversal of Cohen's convictions; (5) whether the district court constructively amended Cohen's indictment in giving its jury instructions; and (6) whether the district court abused its discretion by denying Cohen's request to depose a foreign witness. We will address those issues in that order.

### I   Corrupt Motive

Cohen appeals his conspiracy conviction on the grounds that the district court instructed the jury to disregard his alleged good-faith belief about the legality of his conduct. He argues that *People v. Powell*, 63 N.Y. 88 (1875), requires proof of a

corrupt motive for any conspiracy to commit an offense that is *malum prohibitum*, rather than *malum in se.* We disagree, and we hold that whatever remains of *Powell* does not apply to this case.

In 1875, the New York Court of Appeals ruled in *Powell* that a conspiracy to commit an offense that was "innocent in itself" required evidence of a "corrupt" or "evil purpose." *Id.* at 92. The *Powell* defendants were commissioners of charities for Kings County and had been convicted of conspiring to violate state law by purchasing supplies without first advertising for proposals and awarding a contract to the lowest bidder. *Id.* at 89–90.

The *Powell* Court upheld an appellate court's reversal of the trial court, which had ruled that ignorance of the law was no defense to conspiracy. *Id.* at 89. In doing so, the Court concluded that a conspiracy offense, by nature, required some form of corrupt motive, even if its underlying substantive offense required only an intent to commit the prohibited act. *Id.* at 92. The Court stated that "[p]ersons who agree to do an act innocent in itself, in good faith and without the use of criminal means, are not converted into conspirators [] because it turns out that the contemplated act was prohibited by statute." *Id.*

The *Powell* doctrine was echoed in federal cases from the first half of the last century, but many circuits have since, in effect, moved away from the doctrine. *Compare, e.g., Landen v. United States,* 299 F. 75 (6th Cir.1924) (applying *Powell* to drug wholesalers' conspiracy to sell intoxicating liquor for nonbeverage purposes without the necessary permit), *with United States v. Blair,* 54 F.3d 639 (10th Cir. 1995) (involving, as does this case, offshore bookmaking in violation of § 1084); *United States v. Murray,* 928 F.2d 1242 (1st Cir.1991) (involving an illegal gambling business in violation of 18 U.S.C. § 1955);

*United States v. Thomas,* 887 F.2d 1341 (9th Cir.1989) (involving trafficking in wildlife that the defendant should have known was taken in violation of state law).

Although this Court has long expressed its discontent with the *Powell* doctrine, we have done so in *dicta* in cases involving conspiracies to commit acts that were not "innocent in themselves." *See, e.g., United States v. Mack,* 112 F.2d 290, 292 (2d Cir.1940). In *Mack,* Judge Learned Hand criticized the *Powell* doctrine as "anomalous" and questioned "why more proof should be necessary than that the parties had in contemplation all the elements of the crime they are charged with conspiracy to commit." *Id.* He nevertheless found "'corrupt motive' in abundance" in connection with the defendant's conspiracy to employ unregistered alien prostitutes. *Id.; see also United States v. Eisenberg,* 596 F.2d 522, 526 (2d Cir.1979) ("It being clearly established that requisite knowledge was proved for conviction of the substantive offense, it now follows that the same knowledge is enough as well to establish the conspiracy to commit the substantive offense."); *Hamburg–American Steam Packet Co. v. United States,* 250 F. 747, 759 (2d Cir.1918) ("[W]e are satisfied that as to the crime of conspiracy, ... it is not necessary to show that the defendants who are alleged to have conspired to do an act which is only malum prohibitum had knowledge of the unlawfulness of the act.")

The American Law Institute has expressly rejected *Powell* in its commentary to the Model Penal Code. *See* Model Penal Code § 5.03 note on subsec. 1 & cmt. 2(c)(iii) (1985). The Institute noted that the "melodramatic and sinister view of conspiracy" upon which *Powell* was premised is no longer valid. *Id.* at cmt. 2(c)(iii). It further observed that *Powell* now has "little resolving power in particular cases" and instead "serves mainly to divert atten-

tion from clear analysis of the *mens rea* requirements of conspiracy." *Id.*

In the Institute's view, the *Powell* doctrine was essentially "a judicial endeavor to import fair mens rea requirements into statutes creating regulatory offenses that do not rest on traditional concepts of personal fault and culpability." *See id.* The Institute itself disagreed with that policy, however, concluding that it was a function better left to the statutes themselves. *Id.*

■ In *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975), the Supreme Court, in another context, rejected the notion that a federal conspiracy conviction required proof of *scienter.* We conclude that the *Powell* doctrine does not apply to a conspiracy to violate 18 U.S.C. § 1084.

## II  The Safe Harbor Provision

Cohen appeals the district court for instructing the jury to disregard the safe-harbor provision contained in § 1084(b). That subsection provides a safe harbor for transmissions that occur under both of the following two conditions: (1) betting is legal in both the place of origin and the destination of the transmission; and (2) the transmission is limited to mere information that assists in the placing of bets, as opposed to including the bets themselves. *See* § 1084(b).

The district court ruled as a matter of law that the safe-harbor provision did not apply because neither of the two conditions existed in the case of WSE's transmissions. Cohen disputes that ruling and argues that both conditions did, in fact, exist. He argues that betting is not only legal in Antigua, it is also "legal" in New York for the purposes of § 1084. He also argues that all of WSE's transmissions were limited to mere information assisting in the placing of bets. We agree with the district court's rulings on both issues.

## A.  "Legal" Betting

■ There can be no dispute that betting is illegal in New York. New York has expressly prohibited betting in both its Constitution, *see* N.Y. Const. art. I, § 9 ("no ... bookmaking, or any other kind of gambling [with certain exceptions pertaining to lotteries and horseracing] shall hereafter be authorized or allowed within this state"), and its General Obligations Law, *see* N.Y. Gen. Oblig. L. § 5–401 ("[a]ll wagers, bets or stakes, made to depend on any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful"); *see also Cohen v. Iuzzini,* 25 A.D.2d 878, 270 N.Y.S.2d 278, 279 (1966) (ruling that the predecessor statute to N.Y. Gen. Oblig. L. § 5–401 (N.Y. Penal L. § 991) did not apply to bets executed at recognized pari-mutuel tracks). Nevertheless, Cohen argues that Congress intended for the safe-harbor provision in § 1084(b) to exclude only those transmissions sent to or from jurisdictions in which betting was a crime. Cohen concludes that because the placing of bets is not a crime in New York, it is "legal" for the purposes of § 1084(b).

By its plain terms, the safe-harbor provision requires that betting be "legal," *i.e.,* permitted by law, in both jurisdictions. *See* § 1084(b); *see also* Black's Law Dictionary 902 (7th ed. 1999); Webster's 3d New Int'l Dictionary 1290 (1993). The plain meaning of a statute "should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (alteration and internal quotation marks omitted). This is not the rare case.

Although, as Cohen notes, the First Circuit has stated that Congress "did not intend [for § 1084] to criminalize acts that neither the affected states nor Congress itself deemed criminal in nature," it did not do so in the context of a § 1084 prosecution. *See Sterling Suffolk Racecourse Ltd. P'ship v. Burrillville Racing Ass'n,* 989 F.2d 1266, 1273 (1st Cir.1993). Instead, that case involved a private bid for an injunction under RICO (18 U.S.C. § 1961 *et seq.*) and the Interstate Horseracing Act (15 U.S.C. §§ 3001–07) ("IHA"). *Id.* at 1272–73. It does not stand for the proposition that § 1084 permits betting that is illegal as long as it is not criminal.

In *Sterling,* the defendant was an OTB office in Rhode Island that accepted bets on horse races from distant tracks and broadcasted the races. *Id.* at 1267. The office typically obtained the various consents required under the IHA, *i.e.,* from the host track, the host racing commission, and its own racing commission. *Id.* However, it would often neglect to secure the consent of the plaintiff, a live horse-racing track located within the statutory sixty-mile radius from the OTB office. *Id.* at 1268. The plaintiff sought an injunction against the OTB office under RICO, alleging that it was engaged in a pattern of racketeering activity by violating § 1084 through its noncompliance with the IHA. *Id.*

The *Sterling* court affirmed the district court's denial of the RICO injunction. *Id.* at 1273. It noted first that because the OTB office's business was legitimate under all applicable state laws, it fell under the safe-harbor provision in § 1084(b). *Id.*

Furthermore, the court held that in enacting the IHA, Congress had only created a private right of action for damages on the part of certain parties; it did not intend for any Government enforcement of the IHA. *Id.* Consequently, the plaintiff could not use the IHA together with § 1084 to transform an otherwise legal OTB business into a criminal racketeering enterprise. *Id.*

Neither *Sterling* nor the legislative history behind § 1084 demonstrates that Congress intended for § 1084(b) to mean anything other than what it says.[3] Betting is illegal in New York, and thus the safe-harbor provision in § 1084(b) cannot not apply in Cohen's case as a matter of law. As a result, the district court was not in error when it instructed the jury to disregard that provision.

### B. Transmission of a Bet, Per Se

Cohen appeals the district court's instructions to the jury regarding what constitutes a bet *per se.* Cohen argues that under WSE's account-wagering system, the transmissions between WSE and its customers contained only information that enabled WSE itself to place bets entirely from customer accounts located in Antigua. He argues that this fact was precluded by the district court's instructions. We find no error in those instructions.

Judge Griesa repeatedly charged the jury as follows:

If there was a telephone call or an internet transmission between New York and [WSE] in Antigua, and if a person in New York said or signaled that he or

---

3. In support of his Congressional intent argument, Cohen offers two passages from the Congressional Reports, neither of which is persuasive. Together, the two passages evidence an intent to assist the states in enforcing gambling "offenses" and in suppressing "organized gambling activities" without preempting the states' own prosecutions of those offenses. *Compare* H.R. Rep. No. 87–967 (1961), *reprinted in* 1961 U.S.C.C.A.N 2631, 2631, *with id.* at 2633. Those passages do not demonstrate an intent to exclude illegal yet non-criminal gambling activity from the statute's purview.

she wanted to place a specified bet, and if a person on an internet device or a telephone said or signaled that the bet was accepted, this was the transmission of a bet within the meaning of Section 1084. Congress clearly did not intend to have this statute be made inapplicable because the party in a foreign gambling business deemed or construed the transmission as only starting with an employee or an internet mechanism located on the premises in the foreign country.

▮ Jury instructions are not improper simply because they resemble the conduct alleged to have occurred in a given case; nor were they improper in this case. It was the Government's burden in this case to prove that someone in New York signaled an offer to place a particular bet and that someone at WSE signaled an acceptance of that offer. The jury concluded that the Government had carried that burden.

Most of the cases that Cohen cites in support of the proposition that WSE did not transmit any bets involved problems pertaining either to proof of the acceptance of transmitted bets, see *United States v. Truesdale*, 152 F.3d 443 (5th Cir. 1998), *McQuesten v. Steinmetz*, 73 N.H. 9, 58 A. 876 (1904), *Lescallett v. Commonwealth*, 89 Va. 878, 17 S.E. 546 (1893), or to proof of the locus of a betting business for taxation purposes, see *Saratoga Harness Racing, Inc. v. City of Saratoga Springs*, 55 A.D.2d 295, 390 N.Y.S.2d 240 (1976).

No such problems existed in this case. This case was never about taxation, and there can be no dispute regarding WSE's acceptance of customers' bet requests. For example, a March 18, 1998 conversation between Spencer Hanson, a WSE employee, and a New York-based undercover FBI agent occurred as follows:

Agent: Can I place a bet right now?

Hanson: You can place a bet right now.

Agent: Alright, can you give me the line on the um Penn State/Georgia Tech game, it's the NIT [T]hird Round game tonight.

Hanson: Its [sic] Georgia Tech minus 7½, total is 147.

Agent: Georgia [T]ech minus 7½, umm I wanna take Georgia Tech. Can I take 'em for 50?

Hanson: Sure.

WSE could only book the bets that its customers requested and authorized it to book. By making those requests and having them accepted, WSE's customers were placing bets. So long as the customers' accounts were in good standing, WSE accepted those bets as a matter of course.

▮ Moreover, the issue is immaterial in light of the fact that betting is illegal in New York. Section 1084(a) prohibits the transmission of information assisting in the placing of bets as well as the transmission of bets themselves. This issue, therefore, pertains only to the applicability of § 1084(b)'s safe-harbor provision. As we have noted, that safe harbor excludes not only the transmission of bets, but also the transmission of betting information to or from a jurisdiction in which betting is illegal. As a result, that provision is inapplicable here even if WSE had only ever transmitted betting information.

### III  Cohen's Mens Rea

Cohen appeals the district court's instruction to the jury regarding the requisite *mens rea* under § 1084. Section 1084 prohibits the "knowing" transmission of bets or information assisting in the placing of bets. *See* § 1084(a). The district court instructed the jurors that to convict, they needed only to find that Cohen "knew that the deeds described in the statute as being prohibited were being done," and that a

misinterpretation of the law, like ignorance of the law, was no excuse.

Cohen argues that he lacked the requisite *mens rea* because (1) he did not "knowingly" transmit bets, and (2) he did not transmit information assisting in the placing of bets or wagers to or from a jurisdiction in which he "knew" betting was illegal. He contends that in giving its jury charge, the district court improperly instructed the jury to disregard that argument.

The district court was correct; it mattered only that Cohen knowingly committed the deeds forbidden by § 1084, not that he intended to violate the statute. *See Bryan v. United States*, 524 U.S. 184, 193, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998). Cohen's own interpretation regarding what constituted a bet was irrelevant to the issue of his *mens rea* under § 1084.

■ In any event, Cohen is culpable under § 1084(a) by admitting that he knowingly transmitted information assisting in the placing of bets. His beliefs regarding the legality of betting in New York are immaterial. The legality of betting in a relevant jurisdiction pertains only to § 1084(b)'s safe-harbor provision. As we have already discussed, that safe-harbor provision, as a matter of law, does not apply in this case.

## IV   Rule of Lenity

Cohen argues that the rule of lenity, a concept grounded in due process, requires a reversal of his convictions. According to Cohen, § 1084 is too unclear to provide fair warning of what conduct it prohibits. In particular, he contends that the statute does not provide fair warning with respect to (1) whether the phrase "bet or wager" includes account wagering, (2) whether "transmission" includes the receiving of information as well as the sending of it, and (3) whether betting must be legal or merely non-criminal in a particular jurisdiction in order to be considered "legal" in that jurisdiction. None of these contentions has any merit.

■ The rule of lenity applies where there exists a "grievous ambiguity" in a statute, *see Huddleston v. United States*, 415 U.S. 814, 831, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974), such that "after seizing everything from which aid can be derived, [a court] can make no more than a guess as to what Congress intended." *Reno v. Koray*, 515 U.S. 50, 65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal quotation marks and citation omitted). The rule exists to prevent courts from "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266–67, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

■ We need not guess whether the provisions of § 1084 apply to Cohen's conduct because it is clear that they do. First, account-wagering is wagering nonetheless; a customer requests a particular bet with WSE by telephone or internet and WSE accepts that bet. WSE's requirement that its customers maintain fully-funded accounts does not obscure that fact.

Second, Cohen established two forms of wire facilities, internet and telephone, which he marketed to the public for the express purpose of transmitting bets and betting information. Cohen subsequently received such transmissions from customers, and, in turn, sent such transmissions back to those customers in various forms, including in the form of acceptances and confirmations. No matter what spin he puts on "transmission," his conduct violated the statute.

Third, it is clear to lawyer and layman alike that an act must be permitted by law in order for it to be legal. *See* Black's Law Dictionary 902 (7th ed. 1999); Webster's 3d New Int'l Dictionary 1290 (1993). It is also clear that betting is not permitted under New York law. *See* N.Y. Const. Art. I, § 9(1); N.Y. Gen. Oblig. L. § 5–401. Where a state's statute declares an act to be "unlawful," *see* N.Y. Gen. Oblig. L. § 5–401 ("all wagers . . . shall be unlawful"), that act is not "legal," *see* § 1084(b). The safe-harbor provision is unambiguous, and is not applicable in Cohen's case.

## V  *Aiding–and–Abetting Liability*

Cohen contends that the district court constructively amended his indictment by instructing the jury on criminal aiding-and-abetting liability under 18 U.S.C. § 2(b) rather than under § 2(a) of that title. Cohen argues that as a result, the district court failed to instruct the jury that before convicting Cohen for aiding and abetting his subordinates' conduct, it must find that those subordinates were themselves guilty of crimes. Cohen also argues that he could not have been liable under § 2 for acts committed after his arrest. We find no error in either instance.

■ A constructive amendment can occur when jury instructions change an essential element of the charges in the indictment so as to "deprive a defendant of an opportunity to meet the prosecutor's case." *See United States v. Helmsley,* 941 F.2d 71, 90 (2d Cir.1991). (concluding that "the indictment and the jury charge . . . comported with one another in all essential respects, and [the defendant] had adequate notice of the conduct she was called upon to defend").

The district court indicated to the parties at the charging conference that it would only charge aiding-and-abetting lia-

bility under § 2(a). Section 2(a) requires proof that someone other than the defendant committed the underlying crime. *See United States v. Smith,* 198 F.3d 377, 383 (2d Cir.1999).

Instead, the district court charged the jury under § 2(b), which requires only that the defendant willfully cause another person to commit an act which would have been a crime had the defendant committed it himself. *See* 18 U.S.C. § 2(b); *United States v. Concepcion,* 983 F.2d 369, 383–84 (2d Cir.1992). Section 2(b), unlike § 2(a), does not require proof that someone else committed a crime.

■ Despite having charged § 2(b) rather than § 2(a), the district court did not amend Cohen's indictment. Cohen was charged in his indictment with violations of 18 U.S.C. § 2, *see* A15, and the district court gave the jury a proper instruction under that statute. Although there may have been some confusing colloquy between the district court and counsel prior to the jury charge, the charge was consistent with the indictment. There was no amendment.

■ Furthermore, Cohen could still have been liable for aiding and abetting the acts charged in Counts Seven and Eight of his indictment, even though those counts pertained to transmissions that occurred after his arrest. Cohen was a moving force behind WSE's entire operation, which continued to function after his arrest. Cohen retained his position as President of WSE while on bail after his arrest.

Although Cohen purportedly did not "deal with daily operations" at WSE after his arrest, he also made no effort to curtail those operations. In fact, he benefitted from them by receiving a salary, his travel expenses, and his legal fees from WSE. He clearly was still in a position to cause others, willfully, to commit acts that would

have been crimes had he himself committed them. He could, therefore, have been found liable for aiding and abetting WSE's ongoing violation of § 1084.

### VI  Deposition of a Foreign Witness

Cohen argues that the district court should have granted his motion, pursuant to Fed.R.Crim.P. 15(a), to adjourn his trial for one week so that he could depose a witness in Antigua. The witness, an Antiguan government official, was unavailable for trial due to medical reasons. That testimony, however, was not material to Cohen's trial, and thus the district court did not abuse its discretion in denying the motion.

Under Rule 15(a), a trial court may, in its discretion, order the deposition of a witness for use at trial "[w]henever due to exceptional circumstances of the case it is in the interests of justice." Fed. R.Crim.P. 15(a). A movant must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice. *See United States v. Singleton*, 460 F.2d 1148, 1154 (2d Cir.1972).

Cohen states that the witness' testimony was material to two issues at his trial: (1) whether Cohen had a corrupt motive; and (2) whether Cohen believed that he was transmitting mere information assisting in the placing of bets rather than any bets themselves. Cohen states that the witness would have testified to the advice she gave him based upon her experience as an Antiguan official and upon her alleged conversations with U.S. Government officials.

As this Court has already discussed, neither of these two issues was relevant to the question of Cohen's guilt under § 1084. Cohen's purported motive was irrelevant to the issue of his conspiracy conviction, or to any other issue in his case. *See supra*,

part I. His beliefs regarding the nature of WSE's transmissions were equally irrelevant in view of the fact that § 1084(b)'s safe harbor was, as a matter of law, inapplicable to him. *See supra*, part II. Therefore, the district court was well within its discretion in denying the motion.

### CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.