**STATE of Minnesota, Respondent,**

v.

**Alonzo Jerome GRAHAM, Appellant.**

**No. A07–1759.**

Supreme Court of Minnesota.

April 23, 2009.

---

Leonardo Castro, Hennepin County Chief Public Defender, Paul J. Maravigli, Assistant Public Defender, Minneapolis, MN, for appellant.

Lori Swanson, Minnesota Attorney General, Saint Paul, MN and Michael O. Freeman, Hennepin County Attorney, Michael K. Walz, Assistant County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

ANDERSON, Paul H., Justice.

On May 14, 2007, a Hennepin County jury found appellant Alonzo Graham guilty of one count of first-degree murder while committing or attempting to commit first-degree aggravated robbery, Minn.Stat. § 609.185(a)(3)(2008), and six counts of attempted first-degree aggravated robbery, Minn.Stat. § 609.245, subd. 1 (2008). The district court convicted him of one count of first-degree murder while committing or attempting to commit first-degree aggravated robbery and five counts of attempted first-degree aggravated robbery. Graham filed a direct appeal to this court. He raises two primary issues on appeal: (1) whether the State committed prosecutorial misconduct or error, and (2) whether reversal is required because the lead prosecutor for the State was unauthorized to practice law at the time of Graham's trial. We affirm.

This case arose from events that occurred in South Minneapolis on June 24, 2006. At approximately 3:30 p.m. on Saturday, June 24, Paris Furcron stopped by E.M.'s home. All of the residents of the home were there that afternoon, including the owner, E.M., her companion J.M., her brother C.H., her son Roderick M., and her grandson Readon M. Furcron was a longtime friend of the family and a frequent visitor to the home.

When Furcron stopped by that afternoon, he informed Roderick M. that there were two men outside in a car who wanted to buy marijuana. According to Roderick, it was the first time Furcron had asked to purchase marijuana from him. Roderick agreed to sell one-half ounce of marijuana to the men. Because he did not want the unknown men to come into the home, Roderick sent Furcron outside to get the money and told Furcron to return to the home in order to complete the sale.

Furcron left through the front door. Shortly thereafter, the residents of the house heard knocking at the back door. C.H. went to the back door and saw Furcron outside. When C.H. opened the door, two men pushed Furcron into the house and then followed him into the house. The two men were African–American and had braids in their hair. One man was taller than the other. The taller man was point-

ing a gun at Furcron as he entered the house. After entering the house, the two men pushed Furcron and C.H. into the dining room. From the dining room, each member of the family was visible except Readon M., who was in the closed-in porch.

After the men entered the dining room, several things happened, the timeline for which was unclear at trial. At some point, the two men ordered the family to empty their pockets and get down on the floor; Roderick M. escaped out the front door; and Readon M., who heard the commotion from the porch, stuck his head out and was ordered to get down on the floor. The witnesses testified that the two men kept repeating the phrase "where's it at," as the tall man patted down Furcron and C.H. and the short man rummaged around the dining room. The witnesses testified that when the two men did not find money, or whatever else they were looking for, they became frustrated. The short man said, "shoot 'em all," and the tall man cocked his gun.

Reports vary as to what exactly happened next, but somehow Furcron and the tall man "tussled" for the gun. The tall man was able to wrestle the gun free and fired a shot at Furcron, causing Furcron to fall to the floor in the kitchen. After this first shot, E.M. fled out the front door, and J.M. and Readon M. broke through a porch window. C.H. remained in the house as the tall man fired two more shots at Furcron. The short man then said "we gotta go" and both men left through the back door.

Roderick M. was standing outside the back door when the two men left the house. After escaping from the house during the robbery, Roderick had approached neighbors from across the alley and asked to borrow their cell phone. Roderick had called 911 and was on the tele-

phone with the 911 operator when he heard gunshots. Roderick testified that after hearing the shots, he saw the two men run out the back door. According to Roderick, the tall man stopped and pointed the gun at him, but when the short man said "come on, come on," the tall man turned and both men ran down the alley. As the two men ran away, Roderick told the 911 operator he could identify the men.

After the two men left, Roderick M. went back into the house, where he found Furcron slumped on the floor in the hallway between the bedrooms. C.H. was with Furcron. According to C.H., after being shot, Furcron had gotten up from the kitchen floor and stumbled toward the hallway before collapsing. Roderick and C.H. tried to help Furcron, but Furcron died before police and paramedics arrived. The paramedics discovered that Furcron had been shot twice in the leg and once through his arm and into his chest.

During their investigation that night, the police found a black Nissan parked in the alley that ran behind the house. The Nissan was backed up into an alley driveway two houses down and was found with one car door open and the keys in the ignition. The police investigation revealed that the car belonged to appellant Alonzo Jerome Graham. The police seized two cell phones found in the car and discovered that one of the phones had a number traceable to Durrell Bobo. When an expert later searched the car for forensic evidence, he found two more cell phones and two fingerprints.

The police took E.M., Roderick M., Readon M., and C.H. to the police station. J.M. was transported to the hospital for treatment of injuries sustained during his escape from the house. The police compiled two six-person sequential photo lineups. One lineup contained a picture of Graham wearing an afro instead of braids;

the other line-up included a picture of Bobo. Both Readon M. and Roderick M. identified Graham as the shooter and Bobo as the shorter man. Both C.H. and E.M. identified Bobo but did not identify Graham. C.H., who identified Graham at trial, said he had been confused because of the differing hairstyles. J.M. subsequently identified both Graham and Bobo.

Officer Valerie Goligowski conducted interviews at the crime scene and Sergeants Charles Adams and Arthur Knight performed the interviews at the police station. The sergeants made a tape of the interviews with C.H. and Readon M., but no tape was made of the interview with Roderick M. The witnesses consistently described one taller and one shorter man, both wearing braids. The witness explained that one man had been wearing a black t-shirt and one had been wearing a red checked button-down shirt. The witnesses disagreed on which man was wearing which style shirt, and the witnesses' descriptions differed on various other details.

The police arrested Graham on June 27, 2006, at an apartment in Fridley. At the apartment, the police recovered a black shirt, two black doo-rags, and two pair of pants. Following his arrest, Graham was indicted by a grand jury for six counts of attempted first-degree aggravated robbery under Minn.Stat. § 609.245, subd. 1, and one count of first-degree murder while committing or attempting to commit first-degree aggravated robbery under Minn. Stat. § 609.185(a)(3).

Shortly before Graham's trial was to begin, two alibi witnesses for Graham came forward. When the State expressed concern that the alibi witnesses may offer false testimony, the district court appointed independent counsel for the witnesses, and they subsequently decided to invoke their Fifth Amendment rights. At trial, the State called each resident of the South Minneapolis home to provide eyewitness testimony. The State also presented evidence that the fingerprints obtained from the black Nissan belonged to Graham, the DNA evidence obtained from the phones in the Nissan did not exclude Graham, and the clothing found when Graham was arrested matched the witnesses' descriptions of the clothing worn by the assailant who had shot Furcron.

Graham's defense focused on impeachment of the eyewitness testimony. Defense counsel attempted to impeach the State's witnesses with the information contained in the police summaries, a transcript of the taped interviews, and the tape of the interview, but their attempts were limited by the district court's evidentiary rulings. The jury found Graham guilty on all seven counts, and he was convicted on one count of first-degree murder while committing or attempting to commit first-degree aggravated robbery and five counts of attempted first-degree aggravated robbery.

I.

Graham argues that a new trial is required because the State committed prosecutorial misconduct. Graham's argument for a new trial rests on several claims: that the State's actions with regard to the alibi witnesses were improper; that the State improperly obstructed defense counsel's impeachment of witnesses; and that the State's closing argument constituted prosecutorial misconduct. If we conclude that the State committed prosecutorial misconduct, we will grant a new trial when the misconduct "impaired the defendant's right to a fair trial." *State v. Clifton*, 701 N.W.2d 793, 798–99 (Minn. 2005) (citation omitted) (internal quotation marks omitted).

■ This case involves only objected-to allegations of misconduct. We have yet to decide whether the two-tiered approach for objected-to prosecutorial misconduct as set forth in *State v. Caron* remains viable. *State v. McCray*, 753 N.W.2d 746, 754 n. 2 (Minn.2008) (citing *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974), *abrogated on other grounds by State v. Ramey*, 721 N.W.2d 294, 299 (Minn.2006)). Under *Caron*, when reviewing claims of serious prosecutorial misconduct, we do not reverse if the misconduct is harmless beyond a reasonable doubt. *Caron*, 300 Minn. at 127, 218 N.W.2d at 200. If the case involves less serious prosecutorial misconduct, we applied the test "of whether the misconduct likely played a substantial part in influencing the jury to convict." *Id.* at 128, 218 N.W.2d at 200. Because we are able to resolve Graham's claims without reaching the issue, we do not decide here "whether the *Caron* analysis remains viable or whether a different analysis applies in determining whether objected-to prosecutorial misconduct warrants a new trial." *McCray II*, 753 N.W.2d at 754 n. 2. "We also retain, under our supervisory power, the right to grant a new trial 'prophylactically or in the interests of justice,' without a further determination of prejudice." *Clifton*, 701 N.W.2d at 799 (citation omitted).

## A. Appointment of Independent Counsel for the Alibi Witnesses

We first address Graham's claim that the State committed error by suggesting that two alibi witnesses could be subject to prosecution and by petitioning the district court to have independent counsel appointed to represent the two witnesses. Shortly before trial, the State received notice that two alibi witnesses would be testifying on Graham's behalf. The two witnesses were Graham's former girlfriend and the former girlfriend's mother. According to

statements given to an investigator, the girlfriend intended to testify that Graham had been at her home on the evening in question. Her mother would also testify that she had seen Graham that evening.

During pretrial hearings, the State expressed concern that the alibi testimony being offered was false. The State explained to the district court that at the time of the murder Graham was under a court order to have no contact with the girlfriend, who had been the victim of Graham's terroristic threats. Further, before pleading guilty to the charge of terroristic threats, Graham had written a letter to the girlfriend from jail instructing her on what she must say to exonerate him from the terroristic threats charge. The State also expressed concern over the late appearance of the witnesses-nine months after commission of the crime.

In moving to have independent counsel appointed for the alibi witnesses, the State argued that "if the statements [the two witnesses] already provided prove to be false, they could be both be charged with aiding an offender [under Minn.Stat. § 609.495 (2008)], and the sentence that crime would carry is half of what the defendant is looking at...." The State indicated there was an active investigation into whether the witnesses' statements were false. Defense counsel objected to the appointment of counsel, arguing that the State was issuing an "implicit threat to the witnesses not to testify," and interfering with Graham's due process rights under the state and federal constitutions.

The district court agreed there was some possibility the witnesses could incriminate themselves, and concluded the witnesses should have the opportunity to consult with counsel if they felt the need to do so. Independent counsel was then appointed. Independent counsel read the

file and spoke with the prosecutor, then met with the two witnesses. After meeting with independent counsel, each witness decided to invoke her Fifth Amendment privilege. The witnesses never spoke directly with the prosecutor, and only spoke with the court on the record when being assisted by the independent counsel.

We begin by noting that the allegation of State intimidation of defense witnesses is not to be taken lightly. As an agent of the government, a prosecutor must be more than just an advocate for its side—he or she is also an officer of the court and a minister of justice. *State v. Dobbins*, 725 N.W.2d 492, 513 (Minn.2006). It is paramount that the State not use its power inappropriately to affect the testimony of prospective witnesses. In defining the role of the State in dealing with prospective witnesses, the American Bar Association (ABA) *Standards for Criminal Justice* states that:

> A prosecutor should advise a witness who is to be interviewed of his or her rights against self-incrimination and the right to counsel whenever the law so requires. It is also proper for a prosecutor to so advise a witness whenever the prosecutor knows or has reason to believe that the witness may be the subject of a criminal prosecution. However, a prosecutor should not so advise a witness for the purpose of influencing the witness in favor of or against testifying.

Am. Bar Ass'n, *ABA Standards for Criminal Justice: Prosecution Function and Defense Function* § 3–3.2(b), at 53 (3d. ed.1993).

The ABA standard presents a potential conflict for prosecutors. On the one hand, a prosecutor should not hamper a defendant's constitutional right to present a defense. Both the United States Constitution and the Minnesota Constitution provide a defendant with a fundamen-

tal constitutional right to present a full defense. *See State v. Penkaty*, 708 N.W.2d 185, 201 (Minn.2006) (citing U.S. Const. amend. XIV; Minn. Const. art. I, § 7). The defendant has a right to " 'present the defendant's version of the facts . . . to the jury so it may decide where the truth lies,' " and this includes the right to call witnesses. *Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)); *see also Penkaty*, 708 N.W.2d at 201.

On the other hand, a prosecutor should protect a witness's Fifth Amendment right against self-incrimination. A defendant's constitutional right to present a defense is not an unfettered right; it does not permit a defendant to compel a prospective witness to waive her Fifth Amendment privilege against self-incrimination. *State v. Moose*, 266 N.W.2d 521, 525 (Minn.1978). Both the United States and the Minnesota Constitutions preserve a right not to incriminate one's self. U.S. Const. amend. 5; Minn. Const. art. I, § 7.

In determining whether the State has infringed on a defendant's constitutional right to present a defense by warning a witness of possible self-incrimination, federal courts have held that "the dispositive question in each case is whether the government actor's interference with a witness's decision to testify was 'substantial.' " *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir.2005) (citing *United States v. Crawford*, 707 F.2d 447, 449 (10th Cir. 1983)). Federal courts prohibit the State from giving warnings of self-incrimination that "exert such distress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Commonwealth v. Jennings*, 225 Pa.Super. 489, 311 A.2d 720, 722 (1973) (citing *Webb v. Texas*, 409 U.S. 95, 98, 93

S.Ct. 351, 34 L.Ed.2d 330 (1972)) (internal quotation marks omitted). The inquiry into whether interference is substantial is "'extremely fact specific.'" *U.S. v. True*, 179 F.3d 1087, 1090 (8th Cir.1999) (quoting *United States v. Vavages*, 151 F.3d 1185, 1190 (9th Cir.1998)). Factors include "the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor's or judge's basis in the record for believing the witness might lie." *True*, 179 F.3d at 1090 (quoting *Vavages*, 151 F.3d at 1190).

■ Here we face a slightly different, although related, question—whether the State committed error in requesting independent counsel be appointed to advise a witness of possible self-incrimination. We have not, up to now, articulated a standard to govern State treatment of prospective defense witnesses under these particular circumstances. We find it prudent to do so today. We choose to apply a two-part test for determining whether the State has acted properly in seeking the appointment of independent counsel for defense witnesses. First, the State must be able to point to facts that support a reasonable and substantial belief that the witness will offer false or self-incriminating testimony. Second, once the State has demonstrated a reasonable basis for believing a witness's testimony may be false or self-incriminating, the warnings of self-incrimination must be given in an appropriate manner, so as not to preclude a witness's free and voluntary choice to testify by exerting undue distress on the witness. *See Jennings*, 311 A.2d at 722 (citing *Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972)).

■ We conclude, based on application of the two-part test, that the State acted properly here. First, the State was able to point to facts supporting a reasonable and substantial belief that the two witnesses would testify falsely. The State articulated the following facts. The primary witness was the defendant's former girlfriend, and she had been the victim of the defendant's prior terroristic threats. Before ultimately pleading guilty to the terroristic threats charge, the defendant had written a letter to the witness from jail telling her to lie for him so that he would be acquitted of the charge. As a result of the terroristic threats conviction, the defendant was under a no-contact order with the witness at the time of the murders. The second witness was the mother of the girlfriend. Neither witness came forward with an alibi until nine months after the defendant was charged, and Graham's co-defendant, Bobo, had implicated Graham in the murder when Bobo entered his guilty plea. We conclude that these facts are sufficient to establish a reasonable and substantial belief that the two witnesses may have testified falsely had they taken the witness stand.

Second, we look at the manner in which the State raised the self-incrimination issue to determine whether the witnesses made a free and voluntary choice to testify. Graham focuses primarily on the State's characterization, made to the district court outside the presence of the witnesses, that the "the witnesses face *impending* criminal liability if they testify." (Emphasis added). Graham points to cases which indicate that it is improper for either the State or the court to make direct threats to the witnesses or to threaten prosecution regardless of the content of the witness testimony. *See, e.g., Jennings*, 311 A.2d at 722.

The record as a whole, however, leads us to the conclusion that the State acted properly. The State raised the issue of self-incrimination with the district court, the court then made a decision based on the evidence to appoint independent coun-

sel to advise the witnesses. The witnesses were provided as much time with counsel as they required to consider their options, and neither the court nor the State talked to the witnesses outside the presence of their independent counsel. The phrase "impending liability" was used only once by the State, and not in the presence of the witnesses or their appointed counsel. Given the appointment of independent counsel and the lack of direct contact between the State and the witnesses, we conclude that the witnesses were able to make a free and voluntary decision.

Because we conclude that State met the requirements of the two-part test, we hold that the State did not commit error when it requested the appointment of counsel to advise the alibi witnesses.

B. *The State's Evidentiary Objections*

Graham next argues that the State committed prosecutorial misconduct because the State obstructed Graham's efforts to impeach witnesses by making improper evidentiary objections that were sustained by the district court. Specifically, Graham points to the State's objections during the cross-examination of Roderick M., Officer Goligowski, C.H., and Sergeant Adams, and argues they represent a pattern of obstruction. We begin by noting that Graham's argument that the State could commit prosecutorial misconduct simply by making objections is unusual. Nevertheless, without reaching the question of whether the State's objections could rise to the level of prosecutorial misconduct, we conclude there was no error here.

In analyzing Graham's claims, we will first consider the evidentiary questions raised by Graham to determine whether the State's objections were improper under the rules of evidence and then address whether the district court's subsequent ruling was in error. We re-view a district court's evidentiary rulings for abuse of discretion. *State v. Amos,* 658 N.W.2d 201, 203 (Minn.2003). Reversal is warranted only when the ruling resulted in prejudice. *Id.* But, when the ruling results in the erroneous exclusion of defense evidence in violation of the defendant's constitutional rights, the verdict must be reversed if "there is a reasonable possibility that the verdict might have been different if the evidence had been admitted." *State v. Post,* 512 N.W.2d 99, 102 (Minn. 1994).

1. *The Cross–Examination of Roderick M.*

During the cross-examination of Roderick M., defense counsel attempted to impeach Roderick with statements attributed to him in an interview summary prepared by Sergeant Adams. Specifically, defense counsel asked about a statement Adams attributed to Roderick which suggested Roderick had left the house earlier than indicated by his trial testimony. Reading from the summary, defense counsel asked if Roderick remembered stating "that he ran out his front door." The State objected, and during the bench discussion asserted that a "lengthy taped interview" existed and that defense counsel should not be able to read a summary into the record. Defense counsel informed the district court that she was not aware of a taped interview. The district court responded by saying "[w]e'll talk about that during the break" and for "[r]ight now if you want to examine him, do it properly and don't argue." Defense counsel proceeded to ask about several statements contained in various police reports without reading from statements and without drawing an objection.

After a recess, the State admitted to having made a misstatement because there was no recorded conversation of Roderick

M.'s interview.[1] However, the State asserted the objection was valid as to form because defense counsel "was literally reading from Officer Adams' summary of an interview verbatim while impeaching the witness." The district court upheld its earlier ruling sustaining the State's objection. Later, during cross-examination of Adams, defense counsel was able to elicit testimony on the statements contained in the interview summary which counsel had been unable to ask of Roderick. Graham later moved for a mistrial on the ground that the court erred when it denied him the opportunity to use impeachment evidence during the cross-examination of Roderick. This motion was denied.

■ Graham now argues that the State was making "unfounded" objections. We consider the question of whether it was error for the district court to sustain the State's objection to defense counsel's use of Sergeant Adams' summary during the cross-examination of Roderick M. We conclude the district court did not abuse its discretion in sustaining the objection.

The issue raised by Graham is whether a witness may be impeached with extrinsic evidence contained in a third-party summary of the witness's statements. To impeach under Minn. R. Evid. 613(a), an inconsistent "statement [whether written or not] need not be shown nor its contents disclosed to the witness at that time, but upon request [it] shall be shown or disclosed to opposing counsel." But, extrinsic evidence "is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Minn. R. Evid. 613(b).

■ Rule 613 permits a party to ask about the contents of a third-party statement that have been attributed to a witness. But if the witness has not adopted the statement attributed to him as his own, counsel may not offer extrinsic evidence in the form of reading verbatim from a third-party summary to impeach the witness. *Hyde v. Kloos* is an early example of this principle. 134 Minn. 165, 168–69, 158 N.W. 920, 921 (1916). In *Hyde,* we upheld a district court ruling which precluded the use of an affidavit for impeachment. Evidence in the case suggested that the witness being questioned did not speak English, and no foundation had been laid which indicated the witness understood the contents of the affidavit she allegedly signed. *Id.* Because the party seeking to use the affidavit to impeach the witness could not establish that the witness had made or adopted the statement, we affirmed the district court's decision to bar the use of the affidavit to impeach the witness. *Id.*

Federal courts, applying an identical rule of evidence, have also prohibited attorneys from impeaching by reading verbatim from a third-party summary. For example, in *United States v. Saget* the Eleventh Circuit Court of Appeals dealt with the admissibility of witness statements contained in a police summary. 991 F.2d 702, 710 (11th Cir.1993). The court held it was "grossly unfair" to allow defense counsel to read verbatim from an FBI summary to impeach the witness whose statements it purported to contain "unless the witness has subscribed to or otherwise adopted the statement as his own." *Id.; see also United States v. Adames,* 56 F.3d 737, 744–45 (7th Cir. 1995); *United States v. Strother,* 49 F.3d 869, 876 (2nd Cir.1995).

1. The prosecutor explained that she had confused the Readon M. interview, which was taped, with the Roderick M. interview, which was not taped.

These cases are also consistent with our holding in *State v. Stofflet*, 281 N.W.2d 494 (Minn.1979). In *Stofflet*, the State, without objection, cross-examined a witness using the content of a police summary. *Id.* at 496. In concluding that the "prosecutor was perfectly justified in cross-examining [the witness] about the[ ] statements," we said that:

> [I]t is the first part of [Rule 613] which, by providing for disclosure to counsel, "protect(s) against unwarranted insinuations that a statement has been made when the fact is to the contrary." In this case, the prosecutor was able to produce extrinsic evidence to back up his questions on cross-examination, although he did not; and such evidence had been disclosed to defense counsel.

*Id.* at 497. Although we upheld the State's use of the contents of the summary to question the witness, in *Stofflet* we assumed the State would have to call the officer who made the summary to the stand in order to introduce extrinsic evidence of the witness's statement. *Id.*

Here, as in *Stofflet*, defense counsel could, and did, ask questions about the contents of the summaries. But unlike *Stofflet*, defense counsel attempted to read verbatim from the summary, and therefore to introduce extrinsic evidence of the summary during its cross-examination of Roderick M. The State objected only when defense counsel's language indicated that counsel was reading from the summary. Defense counsel's use of the summary as extrinsic evidence of statements attributed to Roderick was improper. *See Kloos*, 134 Minn. at 168–69, 158 N.W. at 921; *see also Saget*, 991 F.2d at 710. The extrinsic evidence of the prior statements had to be obtained from the author of the summary who had heard the oral statements. *E.g., Stofflet*, 281 N.W.2d at 497. This in fact was done when defense counsel asked

Adams, who authored the summary, about the statements.

We conclude that the district court did not err in sustaining the State's objection to defense counsel's attempt to read the statement into evidence during the cross-examination of Roderick M. Further, because there was no error in the court's ruling, we conclude that the State's mistake as to the existence of a transcript or tape was harmless.

### 2. Cross–Examination of Officer Goligowski

Officer Goligowski, an investigating officer at the scene of the crime, interviewed Roderick M. and prepared a written summary of the interview. During Roderick's testimony, defense counsel attempted to ask Roderick about his conversation with Goligowski on the night of Furcron's death. Roderick told defense counsel that he did not recall talking with Goligowski and counsel did not proceed to ask specific questions. Then, during the cross-examination of Goligowski, defense counsel began to question Goligowski about statements attributed to Roderick in the written summary. The State objected, arguing that defense counsel's question was improper impeachment because Roderick had not been given the opportunity to admit or deny the statement. The district court sustained the objection and asked defense counsel to move on.

Graham claims the impeachment was proper because Roderick M. stated he did not recall talking with Goligowski. He argues that a witness's failure to recollect is sufficiently inconsistent to allow impeachment under Minn. R. Evid. 613 and *State v. Amos*, 658 N.W.2d 201 (Minn. 2003). *Amos* stands for the proposition that a court has the discretion to admit a witness's prior statements as inconsistent when it believes the witness is feigning

memory loss. *Id.* at 205–06; *see also State v. Caine,* 746 N.W.2d 339, 350 (Minn. 2008). But because there is no evidence Roderick was feigning memory loss, *Caine* and *Amos* are inapposite here.

In *State v. Martin,* we said that laying the proper foundation for impeachment requires proof that the statement is "actually inconsistent" or that the declarant "fails to recollect" it, but we held that the witness must also be given the opportunity to "admit, deny or explain the inconsistency in order for the statement to be admissible to impeach the witness." 614 N.W.2d 214, 224 (Minn.2000) (citations omitted) (internal quotation marks omitted). Roderick M. was asked whether he recalled talking with Goligowski, but he was not given the opportunity to admit, deny, or explain specific statements contained in Goligowski's summary of the interview. Therefore, we conclude that the State's objection and the district court's exclusion of the impeachment evidence were proper.

### 3. Cross–Examination of C.H.

During C.H.'s cross-examination, defense counsel asked, "You told [Sergeant] Adams that you had seen these guys before, is that correct, when he asked you?" The question was based on statements attributed to C.H. in a written interview summary prepared by Sergeant Adams. The State objected to the use of Adams' interview summary because C.H. had been subject to a lengthy interview which had been recorded. Defense counsel agreed to use a transcript of the interview in questioning, which transcript had been created by defense counsel.

After a bench conference, the State made the following statement within earshot of the jury, "[y]ou haven't provided [the transcript] to me." The State then objected to the use of the transcript because a copy had not been provided to the State for verification of its accuracy. The district court ruled that defense counsel could ask questions based on the content of the transcript for the remainder of the afternoon but prohibited counsel from using the transcript as extrinsic evidence. When defense counsel later asked C.H., "you spoke to . . . Sergeant Knight, is that correct?" You recall that? The State objected because defense counsel was referring to a summary "of the same interview" and the "summary isn't necessarily accurate. . . . [A]nd she has an accurate [transcript] that I wasn't provided."

That evening a copy of the transcript of the C.H. interview was provided to the State. The next morning the State argued that use of the transcript should be precluded because the late delivery of the transcript was a discovery violation. In addition, the State asserted prejudice as a result of the late delivery, arguing that had the transcript been timely produced, the State's direct examination of C.H. would have changed. The district court ruled that the transcript of C.H.'s interview with Adams and Knight was excluded under the best evidence rule and not admissible unless both parties stipulated to it in advance. The court also restricted the use of the transcript because it was neither a sworn statement nor an accurate transcription.

After C.H.'s testimony, defense counsel made a motion to use the tape recording of C.H.'s interview during its cross-examination of Sergeant Adams. Defense counsel sought to use the tape to impeach C.H.'s trial testimony. The State objected on the ground that the tape was an hour long and would not be proper impeachment of the few specific statements Graham thought were material. The district court told defense counsel to first allow the officer to recall the relevant events based on his notes, and then "we'll see where we go."

During cross-examination, Adams could not recall a statement from the interview and said that reviewing the tape might help his memory. Defense counsel attempted to introduce the tape, and the State objected. The court upheld the State's objection and excluded use of the tape.

■ Turning first to the question of whether defense counsel should have been permitted to ask questions based on the content of the summaries prepared by the officers, we conclude that the district court erred in sustaining the State's objection. It does not appear from the record that defense counsel was attempting to introduce the statement as extrinsic evidence. Accordingly, defense counsel's examination was proper. *See Stofflet*, 281 N.W.2d at 497; *Hyde*, 134 Minn. at 168–69, 158 N.W. at 921; *see also Saget*, 991 F.2d at 710. But the district court's error in excluding the testimony was harmless beyond a reasonable doubt. Examination of the record reveals that the summaries defense counsel was precluded from using contain few or none of the impeachment points Graham characterizes as essential to his defense.

We next consider the district court's decision to exclude the use of the transcript and tape of C.H.'s interview with Sergeants Adams and Knight. C.H. was an eyewitness to the crime. Defense counsel identified several statements from C.H.'s taped interview that counsel was not able to elicit without access to the tape or transcript. These statements included C.H.'s (1) inconsistency on whether he had seen the assailants around the neighborhood; (2) inconsistency on the skin tone of the taller assailant; (3) denial that during his police interview he stated that the shooter was not in the line-up shown to him by Adams and Knight; and (4) statement during the same interview that Roderick M. was not in the house during the robbery.

■ Because C.H. was an eyewitness to the robbery and shooting, his testimony was central to the State's case. Therefore, defense counsel should have been able to introduce inconsistent statements made during his police interview with Sergeants Adams and Knight. Ideally, a transcript of C.H.'s interview should have been prepared by the State, or, alternatively, the transcript made by defense counsel should have been provided to the State for verification, or the district court should have either ordered the State to verify the relevant parts of the transcript or permitted introduction of the tape.

■ But, even if the district court's erroneous exclusion of defense evidence rose to the level of a constitutional violation, we conclude that any error by the district court in precluding both the tape and the transcript was harmless beyond a reasonable doubt because there was no reasonable possibility that the verdict might have been different if the evidence had been admitted. *Post*, 512 N.W.2d at 102. The State presented several other witnesses who identified Graham as the assailant who shot Furcron, and the State produced physical and forensic evidence tying Graham to the area of the crime. Further, defense counsel was able to ask about most of the impeachment facts raised in this appeal, and was limited only in producing extrinsic evidence of the interview. Given the strength of the State's case and the significant corroborating testimony, we hold that there is no reasonable possibility the jury's verdict would have been different had the evidence been admitted.

4. *Were the Evidentiary Errors Caused by Prosecutorial Error?*

Graham argues that the State's conduct in the above instances constituted prejudi-

cial misconduct because the State was illegitimately obstructing the impeachment of its witnesses. We disagree. First, many the State's objections were proper and were appropriately sustained by the district court. Second, even where we conclude that an objection resulted in an erroneous court ruling, the State's conduct did not constitute prosecutorial misconduct. On the record before us, none of the State's objections were so egregious or improper as to rise to the level of prosecutorial misconduct.

## C. *Closing Argument*

Graham's final prosecutorial misconduct claim concerns comments made by the State during closing argument. At closing argument, the State's discussion of defense counsel's trial tactics extends over several pages of the trial transcript. Graham objects to the following statements made by the State: suggestions that defense counsel's questioning of the witnesses was not based on evidence, but rather was an attempt to distract the jury; statements suggesting that Graham's arguments amounted to throwing things at the wall to "see what sticks"; the argument that it is "very tempting at times to go for a compromise" but "this is not the time for compromise.... [T]his is the time to do the right thing"; and the claim that the victims were entitled to "justice."

 Graham alleges two basic types of misconduct in the State's comments: first, that the State denigrated his defense, and, second, that the State instructed the jury to give justice to a victim. When assessing alleged prosecutorial misconduct during a closing argument, "we look to the closing argument as a whole, rather than to selected phrases and remarks." *Ture v. State*, 681 N.W.2d 9, 19 (Minn.2004). The determination of the propriety of a State's closing argument is

"within the sound discretion of the trial court." *State v. Ray*, 659 N.W.2d 736, 746 (Minn.2003) (citation omitted) (internal quotations marks omitted).

 Graham's first complaint is that the State improperly denigrated his defense. The State "has a right to vigorously argue its case" and it can argue that the "evidence does not support particular defenses." *State v. Davis*, 735 N.W.2d 674, 682 (Minn.2007). But the State may not "belittle the defense, either in abstract or by suggesting that the defendant raised the defense because it was the only defense that may be successful." *Id.* at 682–83; *see also State v. Salitros*, 499 N.W.2d 815, 818 (Minn.1993) (finding misconduct when the prosecutor said that defense attorneys always try to draw attention away from their clients). Here, the statements directed at Graham's defense tactics were couched in arguments about the evidence, including evidence about the witnesses and forensics. Therefore, we conclude that it was not improper for the State to argue that the defense had not, based on the evidence, presented a solid case.

 Graham's second contention is that it was improper for the State to ask for "justice" for the victims. The State is not required to make a colorless closing argument. *State v. Williams*, 586 N.W.2d 123, 127 (Minn.1998). But it is improper for the State to inflame the jury's passions and prejudices against the defendant. *State v. MacLennan*, 702 N.W.2d 219, 235 (Minn.2005). For his argument, Graham cites to *State v. McNeil*, 658 N.W.2d 228, 234–35 (Minn.App.2003), which concerned the sexual abuse of a child. But this case is more akin to *State v. Atkins*, 543 N.W.2d 642 (Minn.1996), in which we concluded that there was no misconduct. In *Atkins*, we said:

Atkins further alleges that the prosecutor committed misconduct in telling the jury that it would be an "unspeakable injustice" to consider the lesser-included offenses and to acquit on the charge of first-degree murder. This argument also lacks merit. By the phrase "unspeakable injustice," the prosecutor was not urging the jury to convict Atkins in order to teach him a lesson, to "send a message" to society or otherwise seek justice beyond the parameters of the case, purposes for which we have not hesitated to chastise prosecutors in the past. *See Salitros,* 499 N.W.2d at 819. Nor was the prosecutor encouraging the jury to convict based on personal fear of Atkins or those of Atkins' ilk, or to inflame the jury's passions, purposes which we have also held improper. *See, e.g.,* [*State v.*] *Porter,* 526 N.W.2d [359,] 365 [(Minn. 1995)]; *Post,* 512 N.W.2d at 103. Rather, we conclude that the prosecutor was merely expressing the view that justice could only be achieved by convicting Atkins of first-degree murder, due to the overwhelming evidence establishing his guilt.

*Id.* at 648. Similarly here, the State asked the jury to seek justice based on the evidence and did not pursue an improper purpose. Therefore we conclude the State did not commit prosecutorial error in its closing argument.

We have concluded that the State's request for independent counsel to represent the alibi witnesses was proper, the State's objections to defense counsel's impeachment evidence were either not erroneous or were harmless, and the State's closing argument was proper. Therefore, we conclude that Graham's claims of prosecutorial misconduct or error lack merit.

## II.

Graham also seeks to overturn his conviction because the lead prosecutor in his case was unauthorized to practice law at the time of his trial. Shortly before sentencing, the Hennepin County Attorney's office received notice that its lead prosecutor was not authorized to practice law. The County Attorney learned that the lead prosecutor's license to practice law had been restricted for more than twenty years because she had failed to fulfill her continuing legal education (CLE) credit requirements. Based on this information, defense counsel moved the district court for a mistrial. The court denied the motion.

Graham argues that his conviction should be voided because the lead prosecutor was unauthorized to prosecute him under the laws of Minnesota. Graham supports his arguments by pointing to the criminal nature of the prosecutor's actions under Minn.Stat. § 481.02 and our long-standing emphasis on the importance of licensure in the practice of law. Graham primarily relies on *State v. Harris,* 667 N.W.2d 911 (Minn.2003), and *People v. Dunson,* 316 Ill.App.3d 760, 250 Ill.Dec. 77, 737 N.E.2d 699 (2000), to argue that a conviction obtained by a prosecutor not authorized to practice law must be overturned.

 The status of a conviction obtained by a prosecutor who was not authorized to practice law at the time of trial due to the restricted status of her license presents a legal question which we review de novo. *See Morton Bldgs., Inc. v. Comm'r of Revenue,* 488 N.W.2d 254, 257 (Minn.1992) (stating that the application of law to agreed-upon facts is freely reviewable). While we condemn the failure of counsel to comply with CLE requirements, and to properly record CLE attendance, we deal with licensure issues within the attorney discipline framework, and, in fact, the prosecutor at issue has been subject to

discipline. *In re Graham*, 744 N.W.2d 19 (Minn.2008).[2]

Our focus today " 'is not the punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.' " *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). The question of how to treat a conviction obtained by a prosecutor unauthorized to practice law is one of first impression for us.[3] Graham argues that the status of the prosecutor's legal license renders the trial process so unfair that we must void his conviction. He places considerable weight on the Illinois case of *Dunson*, 316 Ill. App.3d 760, 250 Ill.Dec. 77, 737 N.E.2d 699, in urging us to adopt a rule which per se invalidates any conviction obtained by an unlicensed attorney.

Under its common law, Illinois invalidates any prosecution by an attorney unauthorized to practice law. *Id.* at 702. But Illinois also appears to have a lengthy history of invalidating any action instituted by an unlicensed practitioner whether the case is civil or criminal in nature. *See id.* at 702, 704. Minnesota does not share a similar common law approach. *See State v. Smith*, 476 N.W.2d 511, 513–14 (Minn. 1991) (upholding representation by an unlicensed criminal defense attorney); *Save Our Creeks v. City of Brooklyn Park*, 682

N.W.2d 639, 645 (Minn.App.2004) (declining to dismiss a complaint signed by an unlicensed attorney).

For example, in *State v. Smith*, we faced the question of whether to invalidate the conviction of a defendant when the defendant's attorney was found to have a restricted law license. 476 N.W.2d at 513. The defendant claimed that his Sixth Amendment due process rights were violated by his attorney's lack of licensure. *Id.* We held that a constitutional violation would occur if an imposter—i.e., someone who had never been admitted to the bar—conducted the defense. *Id.* But we said that a "more flexible approach" is required to determine whether a defense conducted by a previously licensed attorney constituted a Sixth Amendment violation. *Id.* at 514.

Smith concerned a defendant's constitutional right to an attorney, and under these circumstances we declined to adopt a per se rule invalidating the trial, preferring a more "flexible approach." *Id.* Neither the state nor the federal constitutions, grant a defendant a comparable right to be prosecuted by a licensed attorney. There does not appear to be any jurisdiction which has held that a defendant's due process rights are per se violated as a consequence of prosecution by an attorney unauthorized to practice law.[4] We conclude

---

**2.** The prosecutor is not related to appellant Graham. We use "Graham" to refer to the appellant only.

**3.** The Minnesota Court of Appeals recently resolved another case prosecuted by the same lead prosecutor. *State v. Ali*, 752 N.W.2d 98 (Minn.App.2008). That decision largely parallels our analysis here. *See id.* at 106–109.

**4.** *See Munoz v. Keane*, 777 F.Supp. 282, 285 (S.D.N.Y.1991) (concluding that a prosecution conducted by an unlicensed attorney does not violate a defendant's right to fair procedure or deprive him of constitutional

safeguards guaranteed under the Due Process Clause); *Dunson*, 250 Ill.Dec. 77, 737 N.E.2d at 706 (relying on common law, not due process, to hold a trial null and void where a non-licensed attorney participated); *Anderson v. State*, 699 N.E.2d 257, 259 (Ind.1998) (requiring defendant to prove prejudice to reverse a conviction obtained by a *de facto* prosecutor); *People v. Pizzaro*, 146 Misc.2d 527, 552 N.Y.S.2d 816, 817 (N.Y.App.Div. 1990) (holding that there is "no constitutional requirement—federal or state[—]that a district attorney or prosecuting attorney be a licensed attorney")

there is no sound basis for applying a per se rule and decline to do so.

■ We do recognize that a trial conducted by a prosecutor unauthorized to practice law has the potential to result in a deprivation of due process and an unfair trial to the accused. But for the reasons articulated in *Smith,* including our reluctance to set aside a criminal conviction when guilt has been fairly established, we adopt a more flexible approach.[5] Accordingly, we hold that convictions obtained by a prosecutor who was unlicensed to practice law at the time of the conviction should be set aside only when the defendant is able to show prejudice warranting reversal.

Graham contends he has been prejudiced by the prosecutor's unauthorized status because, had she completed her required continuing legal education requirements, she would not have committed the many instances of prosecutorial misconduct he has raised in his appeal. But, as discussed above, the State did not commit misconduct in this case and Graham is unable to establish this claim of prejudice. In the absence of any proof of prejudice to Graham, we reject his argument.

Affirmed.

---

**5.** In *Smith,* 476 N.W.2d at 513, we distinguished between an attorney who was at one time licensed and an unlicensed attorney who was an "imposter," having never been admit-ted to the bar. Without deciding the status of a conviction obtained by an imposter, we note that here the prosecutor was, at one point, a licensed attorney.