## STATE v. WAYNE SPENCER.

248 N. W. 2d 915.

December 3, 1976—No. 46285.

*Connolly & Heffernan, John S. Connolly,* and *Thomas J. Barrett,* for appellant.

*Warren Spannaus,* Attorney General, *Gary W. Flakne,* County Attorney, and *Vernon E. Bergstrom, Phebe Haugen, Lee Barry,* and *David W. Larson,* Assistant County Attorneys, for respondent.

Heard before Todd, MacLaughlin, and Yetka, JJ., and considered and decided by the court en banc.

MacLAUGHLIN, JUSTICE.

Defendant, Wayne Edward Spencer, was found guilty by a jury of aggravated assault with a dangerous weapon and was sentenced to 3 to 5 years in the State Prison. The defendant has appealed the judgment of conviction on the following grounds: (1) That the trial court improperly denied defendant's motions to grant testimonial immunity to state witnesses who asserted the Fifth Amendment privilege on cross-examination or, in the alternative, to strike their direct testimony; (2) that the prosecutor committed prejudicial misconduct in his closing argument; and (3) that defendant, a first-time offender, was prejudiced by being sentenced to a minimum 3-year term. For the reasons stated in this opinion, we affirm.

The victim of the aggravated assault, Kenneth Westbrook, occupied an apartment in Minneapolis. In late September 1974 the

defendant and Robert Pittman moved into the apartment with Westbrook. Their relationship was marked almost from the beginning by various disputes. As a result, toward the end of November, Westbrook asked his two roommates to move out. Shortly thereafter, Westbrook left town for 2 weeks and upon his return, on December 10, discovered that they had departed during his absence. Westbrook thought that some of his possessions were missing, and in particular, could not find three or four of his record albums which had been mixed up with those of his roommates while they shared the apartment.

On December 14, 1974, having learned their new address from a friend, Betty Jackson, who occupied an apartment in the same building as Spencer and Pittman, Westbrook went to defendant's apartment to recover his missing record albums. Westbrook arrived about 2:30 p. m. and entered defendant's apartment where he found defendant and Craig Taylor, later a witness for the state.

After an argument about the record albums, Westbrook took those he thought were his and left, but while driving away realized that defendant still had the key to his apartment. Westbrook drove around the block, parked his car and went back upstairs to ask defendant for the key. Another argument ensued, during which defendant threatened Westbrook with a .38-caliber revolver.

Taylor intervened and Westbrook left, but he stopped off in Betty Jackson's apartment on the floor below. Shortly thereafter, while Jackson and Westbrook were in the bedroom, the defendant, Pittman, and Taylor walked into Jackson's apartment. Defendant stood in the bedroom door with one hand behind his back and held out the key with his other hand. Jackson took the key from defendant and went out into the hallway where Pittman and Taylor were standing, leaving Westbrook alone in the bedroom. Defendant brought a gun from behind his back, and without a word, fired one shot into Westbrook's chest from a distance of about 3 feet.

The victim collapsed to the floor and defendant left the apartment. Jackson and Taylor took Westbrook to the emergency room of General Hospital where he was treated for a gunshot wound. He remained in intensive care for approximately 5 days and in the hospital another 2 weeks, having suffered a damaged pancreas and a collapsed lung.

At defendant's trial all of the witnesses present at the assault, with the exception of defendant, testified for the state as to the events which had occurred. Westbrook, the victim, testified that defendant "brought the gun out and shot me." Jackson, Pittman, and Taylor testified that they had heard the shot. Two of the witnesses, Jackson and Taylor, said that they had seen the gun in defendant's hand immediately after the shot was fired. Defendant's counsel argued at trial that the state's witnesses had invented the substance of their testimony after the assault and had agreed to "dump it on Wayne Spencer," although no motive for this was suggested. Defendant subsequently was convicted by the jury, and this appeal followed.

■ The first issue raised by defendant is whether the trial court properly denied defendant's motions to grant testimonial immunity to certain state witnesses who asserted the Fifth Amendment privilege on cross-examination or, in the alternative, to strike their direct testimony.

Westbrook and Jackson both testified on direct examination as to their observations at the time of the shooting. Westbrook said that he had seen the gun being fired and Jackson stated that she had heard the shot, seen the flash of the gun, and observed the weapon in defendant's hand.

Westbrook also testified on direct examination that he was not under the influence of narcotics at the time of the shooting. His testimony demonstrates that he had perceived and could remember the details of the assault clearly. Two eyewitnesses, Jackson and Taylor, testified that Westbrook did not appear to be under the influence of drugs at the time of the incident, as did the detective who saw the victim shortly after the shooting.

On cross-examination, however, Westbrook refused on Fifth Amendment grounds to answer a general question about his past drug use and for the same reason declined to answer specific questions concerning his use of drugs in Jackson's apartment during the 15-minute period before he was shot.

Jackson testified under cross-examination that she had not seen Westbrook take any drugs in her apartment but invoked the Fifth Amendment privilege when asked if she had furnished drugs to Westbrook during that 15-minute period. She also refused to answer a question in regard to her own use of drugs on that same date.

The state's third eyewitness, Craig Taylor, testified that he had heard the shot, that he had seen a gun in defendant's hand, and that he had taken no drugs on the day of the shooting. Robert Pittman also testified for the state that he had seen defendant hand the key to Jackson and that he had heard the shot from his position in the hallway, outside the bedroom. He testified that he saw the victim fall to his knees but did not see a gun. Neither Taylor nor Pittman invoked the Fifth Amendment privilege.

Defendant moved for an order of the trial court, after Westbrook's testimony and again after Jackson's, to grant immunity to these witnesses in order to compel their answers,[1] but the

---

[1] Minn. St. 609.09, subd. 1, provides in part: "In any criminal proceeding, paternity proceeding, or proceeding in juvenile court, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the prosecuting attorney, in writing, requests a judge of the court in which the proceeding is pending to order that person to answer the question or produce the evidence, the judge, after notice to the witness and hearing, shall so order if he finds that to do so would not be contrary to the public interest and would not expose the witness to prosecution in another state or in the federal courts, and that person shall comply with the order.

"After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, he shall not be prosecuted or subjected to penalty or forfeiture for or on account of any transaction, matter or thing concerning which, in accordance with the order, he gave, answered, or produced evidence, * * *."

court deferred its decision until a later time. At the close of its case, the defense moved that the direct testimony of Westbrook and Jackson be stricken since they had not been granted immunity to compel their testimony. This motion was denied by the trial court as was an alternative motion for a mistrial.

Defendant argues that because of the assertion of Fifth Amendment privileges he was deprived of the opportunity to cross-examine Westbrook and Jackson fully as to their use of drugs during the period shortly before Westbrook was shot. The state contends that the questions which Westbrook and Jackson refused to answer were collateral ones, not relevant to the admissibility of their direct testimony but only going to the question of their credibility in the eyes of the jury and the weight to be given to their testimony. The state further argues that the trial court could not have assured, by a grant of immunity from state prosecution, that Westbrook and Jackson would not be subject to Federal prosecution.

An accused has a right to cross-examine a witness against him regarding details of the witness' testimony on direct examination. United States v. Cardillo, 316 F. 2d 606 (2 Cir. 1963), certiorari denied, 375 U. S. 822, 84 S. Ct. 60, 11 L. ed. 2d 55 (1963). That right is guaranteed by the Sixth Amendment's right of confrontation and is secured for defendants in state as well as in Federal criminal proceedings. Pointer v. Texas, 380 U. S. 400, 85 S. Ct. 1065, 13 L. ed. 2d 923 (1965) ; Davis v. Alaska, 415 U. S. 308, 94 S. Ct. 1105, 39 L. ed. 2d 347 (1974).

The trial court has a duty, however, to protect the witness' privilege against self-incrimination by preventing cross-examination in areas which could invade his constitutional protection under the Fifth Amendment. Alford v. United States, 282 U. S. 687, 51 S. Ct. 218, 75 L. ed. 624 (1931) ; Coil v. United States, 343 F. 2d 573 (8 Cir. 1965).

A witness' refusal to answer otherwise permissible questions on Fifth Amendment grounds may, but need not necessarily, violate a defendant's Sixth Amendment right to cross-examine part

or all of the witness' testimony. United States v. Rogers, 475 F. 2d 821 (7 Cir. 1973). In resolving a conflict between the Sixth Amendment right of a criminal defendant to effective cross-examination and the Fifth Amendment right of a witness to decline to give answers which subsequently might be used against him, the courts have made two inquiries: First, whether the witness may properly invoke the privilege on cross-examination, and, second, if so, whether the witness' testimony on direct may nevertheless go to the jury. Fountain v. United States, 384 F. 2d 624 (5 Cir. 1967).

In the instant case it seems clear Westbrook and Jackson properly invoked the Fifth Amendment privilege on cross-examination when they declined to answer questions concerning their use and furnishing of drugs. Therefore, the second question must be answered, that is, whether the witnesses' refusal to answer the specific questions so affected their direct testimony that all or part of their direct testimony should have been stricken by the trial court.

In considering whether the direct testimony of a witness who invokes the privilege against self-incrimination during cross-examination may be used against a defendant, courts have made a distinction between cases where the assertion of the privilege precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness has testified on direct examination. United States v. Cardillo, 316 F. 2d 606, 611 (2 Cir. 1963).

The refusal of a witness to submit to cross-examination on collateral matters, not directly connected to the transactions for which the defendant is being tried and bearing only on the witness' credibility, ordinarily will not require that any of the direct testimony be stricken since there is little danger of prejudice to the defendant. United States v. Stephens, 492 F. 2d 1367 (6 Cir. 1974); United States v. Rogers, 475 F. 2d 821 (7 Cir. 1973); United States v. Cardillo, 316 F. 2d 606 (2 Cir. 1963).

The Court of Appeals for the Eighth Circuit in Coil v. United States, 343 F. 2d 573 (1965) has held that the direct testimony of a witness who invoked the Fifth Amendment privilege on cross-examination as to his use of narcotics need not be stricken since the questions he refused to answer were collateral matters related solely to his credibility as a witness.

We believe that the questions for which Westbrook and Jackson invoked the Fifth Amendment privilege concerned matters which went to their credibility in the eyes of the jury, and that the answers were not material in establishing any of the elements of the crime with which the defendant was charged. The questions were directed toward the witnesses' ability to perceive the events they related on direct examination and the weight to be accorded to that testimony.

The defendant in the instant case was not denied an opportunity to test the validity of the witnesses' direct testimony since Westbrook and Jackson freely answered questions concerning their physical state as well as their ability to perceive and remember the events in question. Moreover, defendant had an opportunity to examine Taylor and Pittman, the other witnesses for the state, not only as to the condition of Westbrook and Jackson but also as to the essential details of the assault. Therefore, we hold that the trial court properly ruled that the witnesses could invoke the Fifth Amendment privilege and did not abuse its discretion when it refused to strike any of the witnesses' direct testimony.

■ The only allegation concerning the prosecutor's final argument which deserves comment is the charge that it contained negative inferences regarding defendant's failure to testify.

In his final argument the prosecutor made the following statement:

"Now, on our facts, and I don't like, like I say, to belabor points, but *we have got the five people standing in this area, and we have heard from four of the five.* * * * That's the testimony. None the less, *four of the five people who were in this apart-*

*ment at this location,* one of them tells us he saw him shoot him, they tell us they heard the shot, Spencer had the gun, and Mr. Pittman also tells us he heard the shooting.

\* \* \* \* \*

"\* \* \* All the evidence is that there was one gun down there and two people, *three people of the four we heard from of the five who were there,* three of those people saw that gun in Wayne Spencer's hand." (Emphasis supplied.)

These closing remarks do not refer directly to defendant's failure to testify. However, the prosecutor, by emphasizing the fact that four of the five people present at the time of the shooting had testified thereby called attention, on three separate occasions, to defendant's failure to take the stand in his own defense.

In the more than a decade since Griffin v. California, 380 U. S. 609, 85 S. Ct. 1229, 14 L. ed. 2d 106 (1965), courts have consistently held that the Fifth Amendment, as applied to the states by the Fourteenth Amendment, forbids comment by the prosecution on a defendant's failure to testify. Further, Minn. St. 611.11 provides that a defendant's failure to testify in any criminal proceeding shall not create any presumption against him "nor shall it be alluded to by the prosecuting attorney or by the court."

Griffin, however, does not preclude a prosecutor's right to comment on the evidence but only prohibits any suggestion that an adverse inference may be drawn from a defendant's failure to testify. The prosecutor in the instant case was summarizing the evidence in his final argument, and it is not possible to ascertain with certainty whether his indirect reference to defendant's failure to testify was a deliberate suggestion that an adverse inference be drawn by the jury. Further, the prosecutor's statements were apparently not considered obvious or important by defendant's counsel since no objection was made to them at trial.

We have repeatedly held that the mere fact that prosecutorial misconduct has occurred during the course of a trial does not, in

and of itself, require reversal. The standards for review of a prosecutor's misconduct were set forth in State v. Caron, 300 Minn. 123, 127, 218 N. W. 2d 197, 200 (1974):

"* * * The test of determining whether prosecutorial misconduct was harmless depends partly upon the type of misconduct with which we are dealing. That is, the more serious the misconduct, the more certain of its effect this court has felt that it should be before labeling the error harmless. Thus, in cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming. * * * On the other hand, in cases involving less serious prosecutorial misconduct this court has applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict."

While we do not condone the inclusion of these remarks in the prosecutor's final argument, we cannot conclude that they played a substantial part in influencing the jury to convict. Indeed, considering the strong evidence against the defendant, the prosecutor's statements met the burden of being harmless beyond a reasonable doubt. Therefore, we cannot agree that the prosecutor's final argument requires a new trial.

■ The final issue is whether defendant, a first-time offender, was denied constitutional or other rights by the imposition of a minimum 3-year prison sentence. Minn. St. 1971, § 609.11, was amended, effective August 1, 1974, to provide for a 3-year minimum sentence for persons convicted of certain crimes while in possession of a firearm.[2] Subsequently, the statute was amended, effective August 1, 1975, to provide that first offenders would

---

[2] Minn. St. 1974, § 609.11, provided in part: "Subdivision 1. All commitments to the commissioner of corrections for imprisonment of the defendant are without minimum terms except when sentence is to life imprisonment as required by law and except that any commitment following conviction wherein the defendant had in his possession a firearm or used a dangerous weapon at the time of the offense shall be for a term of not less than three years, * * *."

be sentenced to a minimum of 1 year plus 1 day. Accordingly, defendant, who was charged with an offense committed between August 1, 1974, and August 1, 1975, is in the group subject to the 3-year minimum sentence. Defendant claims that this unfairly discriminates against him.

In Oksanen v. State, 289 Minn. 516, 517, 184 N. W. 2d 1, 2 (1971) in which a similar issue was raised, we stated:

"Because the Habitual Offender Act, Minn. St. 1961, § 610.28, has been repealed and is now replaced by the so-called Dangerous Offender Act, Minn. St. 609.155 and 609.16, petitioner claims he is denied equal protection of the laws under the State and Federal Constitutions. It seems to be his position that he should be given the retroactive benefit of the new statute, which would reduce his maximum term from 80 years to 30 years. He cites no authority for this proposition, and we are aware of none."

See, also, on the question of retroactivity, State v. Morrissey, 271 Minn. 123, 135 N. W. 2d 57 (1965); State v. Searles, 274 Minn. 199, 142 N. W. 2d 748 (1966); State ex rel. Boswell v. Tahash, 278 Minn. 408, 154 N. W. 2d 813 (1967); and Knisley v. State, 285 Minn. 224, 172 N. W. 2d 769 (1969). We conclude that defendant's claim is without merit.

Affirmed.