STATE OF MINNESOTA

IN SUPREME COURT

A15-1587

Hennepin County

Lincoln Lamar Caldwell,

Appellant,

vs.

State of Minnesota,

Respondent.

Hudson, J.
Took no part, McKeig, J.

Filed: October 19, 2016
Office of Appellate Courts

———————————————

Lincoln Lamar Caldwell, Stillwater, Minnesota, pro se.

Lori Swanson, Attorney General, Saint Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota, for respondent.

———————————————

S Y L L A B U S

1.      Neither the postconviction court nor the State substantially interfered with a recanting witness's decision to testify at an evidentiary hearing.

2.      Where a recanting witness testified before invoking his Fifth Amendment right against self-incrimination, the postconviction court did not abuse its discretion by

1

striking that testimony because the State did not have an opportunity to complete its cross-examination.

Affirmed.

Considered and decided by the court without oral argument.

O P I N I O N

HUDSON, Justice.

In 2008, appellant Lincoln Lamar Caldwell was convicted of first-degree murder for the benefit of a gang on an accomplice-liability theory. We affirmed Caldwell's conviction and the denial of his first two postconviction petitions in August 2011. *See State v. Caldwell* (*Caldwell I*), 803 N.W.2d 373 (Minn. 2011). Caldwell subsequently filed a third postconviction petition in May 2012, in which he alleged that three witnesses presented false testimony at his trial. The postconviction court summarily denied Caldwell's petition. Caldwell appealed to our court, arguing that the postconviction court abused its discretion when it did not grant him an evidentiary hearing. We reversed the postconviction court's decision and remanded the case for an evidentiary hearing on the witness-recantation claim. *See Caldwell v. State* (*Caldwell II*), 853 N.W.2d 766 (Minn. 2014).

Following an evidentiary hearing, the postconviction court denied Caldwell's third postconviction petition. Caldwell appeals, arguing that the State and the postconviction court intentionally misstated the law and intimidated Shawntis Turnage, a recanting witness, when they apprised Turnage of his Fifth Amendment rights. Caldwell also alleges that the postconviction court erred when it struck the testimony Turnage gave before

2

invoking his Fifth Amendment privilege. For the reasons that follow, we affirm the denial of Caldwell's third postconviction petition.

I.

In June 2006, 18-year-old Brian Cole died from injuries he sustained during a drive-by shooting near the corner of Eighth Avenue and Penn Avenue in North Minneapolis. Cole was the unintended victim of a gunshot fired through the open window of an SUV. After conducting an investigation, police officers determined that Cole was standing near members of the One-Nine gang when he was shot. Although Cole was not a member of a gang, the One-Nine gang was engaged in an ongoing rivalry with the LL gang at the time. Witnesses identified Caldwell, who was a member of the LL gang, as the driver of the SUV from which the gunshot originated. Witnesses identified the shooter as another member of the LL gang. Relying on this and other evidence, the State prosecuted Caldwell and the shooter for Cole's murder. *Caldwell I*, 803 N.W.2d at 381.

At Caldwell's trial, the State's witnesses included Carnell Harrison, William Brooks, and Shawntis Turnage. Harrison and Brooks were both passengers in the SUV when Cole was shot, and they testified about Caldwell's role in the shooting. Turnage, who was a friend of Caldwell, was not present during the shooting but testified that Caldwell spoke to him about the shooting at a friend's house shortly afterward. According to Turnage, Caldwell had "got down with the One-Nine[s]," which Turnage understood to mean "fighting or shooting or [a] brawl or something." Turnage testified that Caldwell told him that "Ill Will," one of the leaders of the One-Nine gang, was the "intended target." Caldwell revealed to Turnage that the gun used was a grey and black 9mm Smith and

3

Wesson semiautomatic handgun. Based on Caldwell's description, Turnage recognized the gun as one that he had seen in Caldwell's possession on several occasions.

Following the trial, the jury found Caldwell guilty of all six counts of murder that were charged in the indictment. In June 2008, the district court convicted him of first-degree murder for the benefit of a gang—the most serious offense—and sentenced him to life in prison without the possibility of release.

Caldwell filed a direct appeal of his conviction in September 2008. We stayed his direct appeal while Caldwell filed two petitions for postconviction relief. The postconviction court denied both of Caldwell's postconviction petitions, and Caldwell appealed. We consolidated Caldwell's three appeals. In August 2011, we affirmed Caldwell's conviction and the denial of both petitions for postconviction relief. *See Caldwell I*, 803 N.W.2d at 377.

In May 2012, Caldwell filed his third petition for postconviction relief, in which he alleged that Harrison, Brooks, and Turnage presented false testimony at his trial. In support of his petition, Caldwell submitted a statement from each of the three witnesses, along with a signed and notarized affidavit from the investigator who interviewed each witness. In the affidavit, the investigator confirmed that each witness's statement was an accurate transcription of his recorded interview with the witness. In October 2012, the postconviction court denied Caldwell's petition without holding an evidentiary hearing. The postconviction court was not reasonably well satisfied that the trial testimony of Brooks and Harris was false, nor was it reasonably well satisfied that Turnage's testimony, even if it were false, might have affected the jury's verdict.

4

Caldwell appealed the denial of his third postconviction petition and argued that the postconviction court abused its discretion when it denied his petition without holding an evidentiary hearing. *Caldwell II*, 853 N.W.2d at 768. On appeal, we determined that the postconviction court erred when it summarily denied Caldwell's petition. *Id.* We concluded that Caldwell alleged facts that, if proven, would entitle him to relief. *Id.* Therefore, we remanded the case to the postconviction court for an evidentiary hearing to determine the credibility of the recantations. *Id.* at 778.

In December 2014, the postconviction court held the evidentiary hearing. The postconviction court first determined that it would not admit any witness's recorded statement unless the witness testified. Thereafter, Turnage took the stand. After Turnage was sworn in, the postconviction court gave the following warning:

> Before you begin there is -- there are allegations -- or part of the Petition is that people are recanting their testimony, that they are going to testify differently from what they did at trial. I don't know if that's true or not for you, but because that is the allegation I wanna make sure you understand that you -- you do have certain rights.
>
> Even as a witness you have the right to remain silent if what you say might incriminate yourself. And specifically, the State has mentioned perjury. Don't know if they could charge you or not, or that should dissuade you or not, but if you give two inconsistent statements under oath that are materially different that is perjury. And, the State does not have to prove which one was true or false, just that there are two different statements. Just so you know that that is the law on perjury.
>
> But, I am just stating that so you know what your rights are. So if you give an inconsistent statement you might be incriminating yourself. I don't know what your testimony is gonna be today, but I wanna make sure you understand your rights in that regard.

The court subsequently asked Turnage if he understood his rights, and Turnage replied that he did. The court proceeded to ask Turnage whether he needed time to talk to an attorney or if he could testify that day. Turnage in return inquired whether talking to an attorney "would . . . prolong this" to which the court responded, "Yes." Turnage then said he did not want to talk to an attorney.

Following that colloquy, Caldwell's counsel began his examination of Turnage. Turnage recanted his previous trial testimony, explaining that he had not seen Caldwell on the day of the shooting and had never seen Caldwell with a gun. Additionally, Turnage stated that he did not visit a friend's house with Caldwell on the day of Cole's death or hear Caldwell say he "got down with the One-Nines" at that time. Turnage also explained why his testimony had changed since the trial in 2008. According to Turnage, he was young at the time that he testified and was "intimidated about it."

On cross-examination, the State proceeded to question Turnage about the change in his testimony. The State recounted how Turnage testified under oath at trial and agreed to tell the truth in exchange for a lesser sentence on a separate charge he was facing. Turnage explained that he did not tell the truth at trial. During his testimony, however, Turnage expressed confusion about his right to refrain from answering questions that might incriminate him. The postconviction court at one point told Turnage that he had to answer a question unless he thought it would incriminate him in some way. Turnage responded that he was already incriminated and that he did not know what was going on. Turnage also testified that he suffered a traumatic brain injury resulting in long-term memory loss, so he was unable to recall his previous testimony. When the prosecutor reminded him of

6

his previous testimony in the form of a question, Turnage said he could recall his trial testimony.

The State then attempted to show why Turnage might have changed his testimony. The State asked Turnage if he was approached in prison about his testimony and if he recalled providing multiple statements to investigators that two prisoners threatened to stab him if he did not change his testimony. Turnage said, "No," and immediately asked the court whether he had to continue answering the State's questions. At that time, the postconviction court reminded Turnage:

> [Y]ou do have to answer the questions unless they would incriminate you. If you think this would get you charged with a crime you can refuse to answer if you want, but it's gotta be something that would incriminate you and get you into trouble. But, providing the information, since you have chosen to testify, is something you have to do.

Turnage asked if he was going to be "incriminated more" as a result of testifying, and if he could just say "I plead the Fifth or somethin' like that." The postconviction court explained that it tried to communicate this point to Turnage earlier:

> In slang it's called pleading the Fifth. . . . it says that you can't . . . be forced to incriminate yourself. So, if you think your answer will incriminate you, you don't have to answer. And, you just tell me that you refuse to answer on Fifth Amendment grounds. So if you say that, that's what I'm gonna know you're doin'; all right?

Turnage replied, "Sure thing."

The State continued its cross-examination and at one point asked Turnage if he acknowledged that he was perjuring himself now on the stand or did so at the trial in 2008. Turnage indicated that he did not really understand what perjury was, but that he was "gonna get charged with perjury any way it goes." A few questions later, the State asked

7

Turnage: "Are you aware that in addition to perjury charges you could face charges related to aiding an offender, accomplice after the fact?" Turnage said that he was now aware. The State continued, "By doing so, you know, you could be sentenced up to half of what the Petitioner received in his case, meaning half of a life sentence if really you wanna sit there and say you lied in 2008?" Turnage laughed and said, "What is you tryin' to do, intimidate, man?"

The postconviction court then intervened and told Turnage, "Whether the State . . . can charge you or not is not something that they can't say for sure right now." Turnage asked if he was "gonna get the half of a life sentence?" to which the court responded,

> [N]o. I -- I just wanna be clear that [the State's attorney] may believe he can charge you, but whether he can or not is a different story. And if you - - if that changes your mind on how you wanna testify I would throw it to you to understand that whether or not -- I don't know if he can charge you or not, but when he's told you that does that change your mind about whether you wanna continue to testify?"

Turnage said, "yeah, I change my mind, I don't want no positives no more. So is that good enough?"

> After a bench conference with counsel, the following exchange occurred:
>
> THE COURT: Okay. Mr. Turnage, your testimony so far is -- will stand. In other words, you can't unring a bell; okay? So, your testimony will stand. The Prosecutor's gonna continue to ask you questions. You still have the right for each individual question to decide whether you're gonna refuse to answer on Fifth Amendment grounds; okay? So, when he asks a question make the decision if you're gonna answer it or whether you're gonna refuse to answer on Fifth Amendment grounds; okay?
>
> THE WITNESS: So if -- well -- because I -- what I'm sayin' is this: Cause he --he--I don't know, I don't understand what's goin' on, he talkin' about all this other stuff too much and ha- --life sentences and half a this and perjury and all this type of stuff. I don't want no positives, sir.

8

THE COURT:  Okay.  Earlier you told me that you -- you were fine goin' ahead without a lawyer; where are you at on that right now?

THE WITNESS:  But if this gonna cause this I'm probably gonna need a lawyer.  I didn't know -- I mean, I didn't know this was gonna get to --turned into all this and all this type of stuff.  I mean, like, I don't know; I don't know. He axed [sic] me all these questions I don't know nothin' about; I don't know what's goin' on.

The postconviction court recessed Turnage's testimony to allow Turnage to seek counsel, and he did so.  Caldwell's counsel noted on the record that he "thought there was some intimidation going on" regarding the "potential charges of aiding an offender after the fact."  The postconviction court determined that the prosecutor was not "attempting to intimidate," but rather was "vigorously cross examining on the witness'[s] possible exposure by testifying differently from trial and in a way that would benefit the [d]efendant."  The postconviction court explained, however, that the cross-examination

> led to the point where it was clear to the [c]ourt that the witness needed legal counsel at that point because he seemed uncertain on how he should proceed. And so, [the court] thought it appropriate that [it] break, arrange for counsel for him, and reconvene at a later date.

In early March 2015, the postconviction court resumed the evidentiary hearing.  By that time, Turnage was represented by counsel from the Public Defender's office.  Turnage was re-sworn, invoked his Fifth Amendment privilege against self-incrimination, and refused to answer further questions.  After Turnage was excused, the postconviction court struck Turnage's testimony from the record of the December evidentiary hearing.  The court reasoned that Turnage's December 2014 waiver was not complete, knowing, and voluntary because Turnage was not apprised of the possible charge of aiding an offender,

9

which carries a much more serious penalty than perjury, of which Turnage was advised. Caldwell's counsel objected and asked for additional time to research the question of whether Turnage's testimony should be stricken. The court told Caldwell's counsel it would entertain arguments on the matter. The State then explained that if the State had completed its cross-examination of Turnage, it would have demonstrated that Turnage admitted on at least three separate occasions that his testimony in December 2014 was untruthful. The State proffered that it would have shown that Turnage lied because three individuals threatened him with bodily harm and he received a bribe of $3,000 from C.C. in exchange for his recantation. The postconviction court recessed the hearing.

Caldwell subsequently filed a motion for reconsideration of the postconviction court's order to strike Turnage's testimony. The following day, the court resumed the evidentiary hearing. Brooks could not be located, and Caldwell's counsel was still working on getting Harrison to court to testify. The postconviction court once again addressed Turnage's stricken testimony. The postconviction court gave the State an opportunity to respond in writing to Caldwell's motion, and the State argued that an alternative basis for striking the testimony was that the State did not have an opportunity to cross-examine Turnage on his other statements. The court again recessed the hearing.

The evidentiary hearing continued in late June 2015. The postconviction court heard testimony from Harrison, who recanted his trial testimony. Because Brooks still could not be located, his statement to the defense investigator was not admitted into evidence. Caldwell's attorney rested, the State did not call any witnesses, and the postconviction court took the matter under advisement.

10

At the end of July, the postconviction court issued its order denying Caldwell's third postconviction petition and his motion for reconsideration of the decision to strike Turnage's testimony. The court found that Harrison's testimony was not credible. The court further explained that even if Turnage's testimony were credible, "Caldwell could not meet his burden under the second *Larrison*[1] prong with respect to Turnage."

Now proceeding pro se, Caldwell appeals from the denial of his third postconviction petition. Caldwell appears to make three main arguments.[2] First, he argues that the postconviction court and the prosecutor substantially interfered with Turnage's decision to testify at the postconviction hearing, thereby violating Caldwell's Fourteenth Amendment right to due process. Second, he argues that the remedy for such a violation is dismissal of the indictment. Third, Caldwell argues that the postconviction court erred when it struck all of Turnage's testimony.[3] We address each issue in turn.

---

[1]  *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928).

[2]  As a preliminary matter, Caldwell contends the State violated Minn. R. Civ. App. P. 131.01, subd. 2 (providing that the respondent shall serve and file a brief and addendum, if any, within 30 days after service of the brief of the appellant), when the State filed its respondent's brief on March 3, 2016 (38 days after service of Caldwell's brief). Caldwell's reliance on Rule 131.01 is misplaced. The briefing deadlines for postconviction appeals are set forth in Minn. R. Crim. P. 28.02, subd. 10, which provides that "[t]he respondent must serve and file the respondent's brief within *45 days* after service of the appellant's brief." (Emphasis added.) Because the State's brief was timely filed under Rule 28.02, we deny Caldwell's motion to dismiss the State's brief. *See* Minn. R. Civ. App. P. 125.01(c)(2) (stating filing is complete upon mailing).

[3]  Caldwell also seems to argue that he was denied a fair hearing because on cross-examination, the prosecutor asked Turnage questions that lacked evidentiary support and improperly impugned Caldwell's character. The questions at issue focused on whether

11

II.

We review the denial of postconviction relief for an abuse of discretion. *Reed v. State*, 793 N.W.2d 725, 729 (Minn. 2010). In doing so, we review the postconviction court's legal conclusions de novo and its findings of fact for clear error. *McKenzie v. State*, 872 N.W.2d 865, 870 (Minn. 2015).

Turning to Caldwell's arguments, we first address whether the postconviction court or the prosecutor substantially interfered with Turnage's decision to testify at the postconviction evidentiary hearing. Caldwell argues that the postconviction court and the prosecutor "sat-out [sic] to scare, intimidate and threaten [Turnage] with false and misleading statement[s] of the law." Although Caldwell's brief does not mention the Fourteenth Amendment right to due process, Caldwell seems to be arguing that his due process right to present a complete defense was violated by the prosecutor's and the postconviction court's actions during the hearing. *See State v. Richardson*, 670 N.W.2d 267, 277 (Minn. 2003) ("Due process requires that every defendant be 'afforded a meaningful opportunity to present a complete defense.' " (quoting *State v. Richards*, 495 N.W.2d 187, 191 (Minn. 1992))), *accord* U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. Specifically, Caldwell contends that because of the conduct of the postconviction court and the prosecutor, Turnage decided to exercise his Fifth Amendment right against self-incrimination rather than continue to testify at the hearing. *See Webb v. Texas*, 409

Turnage had recanted his trial testimony in response to threats of violence and a $3,000 bribe from a woman named C.C. Because the State's line of questioning regarding Turnage's motivation for his recantation was supported by the evidence, Turnage's claim is without merit.

U.S. 95, 98 (1972) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, . . . [The defendant] has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.")). *But see State v. Graham*, 764 N.W.2d 340, 349 (Minn. 2009) ("A defendant's constitutional right to present a defense is not an unfettered right; it does not permit a defendant to compel a prospective witness to waive her Fifth Amendment privilege against self-incrimination.").

*McKenzie v. State*, 872 N.W.2d 865, 870 (Minn. 2015) was the first time we considered a claim that a government actor interfered with a witness during a postconviction hearing. There, we assumed without deciding that the Fourteenth Amendment right to present a complete defense applied to postconviction proceedings. *Id.* at 871. Because of this assumption, we applied the "substantial interference" test from *Colbert v. State*, 870 N.W.2d 616, 624-25 (Minn. 2015). *McKenzie*, 872 N.W.2d at 871. Under that test, a defendant "must prove that (1) a government actor interfered with a defense witness's decision to testify; (2) the interference was substantial; and (3) the defendant was prejudiced by the conduct." *Id.* (citing *Colbert*, 870 N.W.2d at 625; and *Graham*, 764 N.W.2d at 349 ("In determining whether the State has infringed on a defendant's constitutional right to present a defense . . . 'the dispositive question in each

13

case is whether the government actor's interference with a witness's decision to testify was "substantial." ' ")).[4]

Here, like in *McKenzie*, we need not decide the exact parameters of what process is due. 872 N.W.2d at 871. Even assuming Caldwell's rights are coextensive with those of a criminal defendant at trial, Caldwell is not entitled to any relief because he cannot show that he was prejudiced by the postconviction court's and the prosecutor's actions. We first address Caldwell's claims against the postconviction court, followed by his claims against the prosecutor.

A.

Caldwell seems to argue that the unobjected-to perjury warnings the postconviction court gave to Turnage throughout his testimony substantially interfered with Turnage's decision to testify. Because Caldwell did not object to the postconviction court's warnings, we review for plain error. *United States v. Binker*, 795 F.2d 1218, 1228-29 (5th Cir. 1986) (applying the plain-error standard when the defendant failed to object to alleged witness interference and concluding that the defendant's due process rights were not violated); *see State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012) (plurality opinion) (applying the plain-error standard to the defendant's witness-interference claim absent objection on due process grounds at trial); *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998) (explaining that when a defendant does not object, we have the discretion to consider the unobjected-to error on appeal if it is a plain error affecting substantial rights).

---

[4] Because we conclude that Caldwell's Fourteenth Amendment right to due process was not violated, we do not address his argument for dismissal of the indictment.

Under the plain-error doctrine, a defendant must establish (1) an error, (2) that is plain, and (3) the error must affect substantial rights. *Griller*, 583 N.W.2d at 740. If these three prongs are met, then we assess whether we should address the error to ensure fairness and the integrity of the judicial proceedings. *Id.* A "plain" error is an error that is "clear or obvious" at the time of appeal. *State v. Peltier*, 874 N.W.2d 792, 799 (Minn. 2016); *State v. Kelley*, 855 N.W.2d 269, 277 (Minn. 2014). "An error is clear or obvious if it 'contravenes case law, a rule, or a standard of conduct.' " *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014) (quoting *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006)). We examine the law in existence at the time of appellate review, not the law in existence at the time of the district court's error, to determine whether an error is plain. *Kelley*, 855 N.W.2d at 277.

In a criminal trial, " 'a due process violation does not arise merely . . . because the government warns a defense witness of the consequences of committing perjury.' " *McKenzie*, 872 N.W.2d at 872 (quoting United *States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000)). A warning of possible self-incrimination violates due process—i.e., substantially interferes with a witness's decision to testify—if the warning is "given in a fashion that exerts 'such duress on the witness'[s] mind as to preclude him from making a free and voluntary choice whether or not to testify.' " *Id.* at 873 (alteration in original) (quoting *Webb*, 409 U.S. at 98). "Factors to consider when determining whether a government actor's action substantially interferes with a witness's decision to testify include 'the manner in which the prosecutor or judge raises the issue, the language of the warnings, and the prosecutor or judge's basis in the record for believing the witness might lie.' " *Id.*

15

(quoting *U.S. v. True*, 179 F.3d 1087, 1090 (8th Cir. 1999)). "Courts have not found due process violations in cases in which there was a high probability that the witness would commit perjury, . . . and those in which the defense witness was independently represented by counsel." *Id.*

Here, the manner in which the postconviction court raised the perjury issue and the language of its warnings did not exert such duress on Turnage's mind as to preclude him from making a free and voluntary choice on whether to testify. In fact, we commend the postconviction court for its efforts to apprise Turnage of his rights and to intervene sua sponte to counter any potential misstatements by the prosecutor. But even assuming that the postconviction court's warnings exerted such duress on Turnage that he felt compelled to invoke his Fifth Amendment rights, the postconviction court's actions did not affect Caldwell's substantial rights. The postconviction court specifically determined that even if Turnage's testimony were credible, "Caldwell could not meet his burden under the second *Larrison*[5] prong with respect to Turnage" because "the jury would not likely have reached a different verdict had the State not called Turnage as a witness at trial." The

_____

[5]     "Under *Larrison*, a petitioner is entitled to a new trial based on false trial testimony if: (1) the court is reasonably well satisfied that the testimony given by a material witness was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know that the testimony was false until after trial." *Caldwell II*, 853 N.W.2d at 772. *Larrison* has been overruled, *see United States v. Mitrione*, 357 F.3d 712, 718 (7th Cir. 2004), but we continue to apply its test in cases involving witness recantation and false testimony. *Ortega v. State*, 856 N.W.2d 98, 103 (Minn. 2014); *Martin v. State*, 825 N.W.2d 734, 739 n.6 (Minn. 2013). Only the first two prongs of the standard are compulsory. *Caldwell II*, 853 N.W.2d at 772.

16

postconviction court drew this conclusion because it determined that Turnage's testimony was cumulative. Indeed, we previously indicated that it was the "combined impact" of Brooks's, Harrison's, and Turnage's allegedly false trial testimony that might have caused the jury to reach a different conclusion regarding Caldwell's guilt. *Caldwell II*, 853 N.W.2d at 776-78. The postconviction court determined that Harrison's recantation was not credible and the court declined to admit Brooks's statement to the defense investigator because Brooks was unavailable to testify. Caldwell does not dispute either of these conclusions on appeal.[6] We therefore conclude that the postconviction court did not err when it determined that, even if Turnage's testimony were credible, Caldwell could not meet his burden under the second *Larrison* prong.

B.

Caldwell next claims that the objected-to cross-examination by the prosecutor interfered with Turnage's decision to testify at the evidentiary hearing because the prosecutor impermissibly threatened to prosecute Turnage for aiding an offender if he testified falsely. During the prosecutor's cross-examination of Turnage, the prosecutor asked the following questions:

> THE PROSECUTOR: Are you aware that in addition to perjury charges you could face charges related to aiding an offender, accomplice after the fact?

_____

[6]     Caldwell also seems to allege unobjected-to witness interference by the prosecutor. When a defendant alleges unobjected-to prosecutorial misconduct, we apply a modified plain-error standard that requires the defendant to show an error was made that was plain. If the defendant satisfies this burden, the burden shifts to the State to establish that the un-objected to misconduct did not affect substantial rights. *State v. Nissalke*, 801 N.W.2d 82, 103 (Minn. 2011). For the same reasons that the postconviction court's unobjected-to actions did not affect Caldwell's substantial rights, the State has established that the prosecutor's unobjected-to actions did not affect Caldwell's substantial rights either.

17

THE WITNESS: Par- -- par- -- you makin' me aware now, so I guess.

THE PROSECUTOR: By doing so, you know, you could be sentenced up to half of what the Petitioner received in his case, meaning half of a life sentence if really you wanna sit there and say you lied in 2008?

THE WITNESS: (Laughing) What is you tryin' to do, intimidate, man?

Caldwell's attorney told the court that he "thought there was some intimidation going on as to the questioning and the allegations that -- or potential charges of aiding an offender after the fact." Shortly after these questions, Turnage indicated that he had changed his mind about whether he wanted to continue to testify. Although Turnage did not specifically invoke his right against self-incrimination at that time, the court recessed the hearing so Turnage could obtain counsel.

> At the conclusion of the hearing that day, the postconviction court explained that it
>
> is not finding that the [p]rosecutor was attempting to intimidate, but -- but vigorously cross examining on the witness' possible exposure by testifying differently from trial and in a way that would benefit the [d]efendant. So I thought it was appropriate cross examination but it led to the point where it was clear to the [c]ourt that the witness needed legal counsel at that point because he seemed uncertain on how he should proceed.

Again, we assume without deciding that the substantial-interference test applies to Caldwell's second claim. Although this is an " 'extremely fact specific' " inquiry, *Graham*, 764 N.W.2d at 350 (quoting *True*, 179 F.3d at 1090), and a closer call, under these circumstances, we conclude that the prosecutor's line of questioning did not substantially interfere with Turnage's decision to testify. The prosecutor's cross-examination was inartful at times, but did not cross the constitutional line. *Graham*, 764 N.W.2d at 349. Moreover, the postconviction court specifically found that the prosecutor was not

18

attempting to intimidate Turnage, but rather to vigorously cross-examine him. The postconviction court was in the best position to make such a determination, having heard the tone of the questioning, and we defer to its finding. *McKenzie*, 872 N.W.2d at 870 (explaining that we defer to the postconviction court's findings of fact unless there is clear error). This finding is not clearly erroneous.

Even assuming that the prosecutor substantially interfered with Turnage's decision to testify, Caldwell has failed to satisfy the third prong of the substantial-interference test from *Colbert*: showing prejudice. As previously discussed, the postconviction court determined that even if Turnage's testimony were credible, "Caldwell could not meet his burden under the second *Larrison* prong with respect to Turnage" because "the jury would not likely have reached a different verdict had the State not called Turnage as a witness at trial." Instead, it was the "combined impact" of the allegedly false testimony of Turnage, Brooks, and Harrison that might have caused the jury to reach a different conclusion regarding Caldwell's guilt. *Caldwell*, 853 N.W.2d at 776-78. Turnage's testimony, standing alone, would not have been enough to satisfy the *Larrison* standard for a new trial. Thus, the postconviction court did not err when it rejected Caldwell's witness-intimidation claim because the alleged conduct was harmless beyond a reasonable doubt. *See Colbert*, 870 N.W.2d at 625.

III.

Finally, we address whether the postconviction court erred when it struck the testimony that Turnage gave before he invoked his Fifth Amendment right against self-incrimination. Caldwell argues that after Turnage exercised his Fifth Amendment

19

privilege, it was "unfair and prejudicial" for the postconviction court to strike Turnage's earlier testimony that was already on the record.

We have not previously articulated the appropriate standard of review to apply in reviewing a postconviction court's decision to strike a witness's entire testimony after the witness invokes the Fifth Amendment. We conclude, however, that the approach recently taken by the United States Court of Appeals for the Eighth Circuit in *United States v. Wilkens*, 742 F.3d 354, 360 (8th Cir. 2014) is persuasive, and today we adopt an abuse of discretion standard of review. In *Wilkens*, the Eighth Circuit concluded that a trial court's decision to strike a witness's testimony after the witness asserts his or her Fifth Amendment privilege against self-incrimination is reviewed for an abuse of discretion, and "only in a case of abuse of such discretion resulting in obvious prejudice should an appellate court intervene." *Id.* at 360 (quoting *United States v. Brierly*, 501 F.2d 1024, 1027 (8th Cir. 1974)). This approach is logical because, to provide a fair truth-seeking process, testimony should be stricken when its truth cannot be tested. *Id.* (citing *Smith v. United States*, 331 F.2d 265, 277 (8th Cir. 1964)).

Despite Caldwell's objection, the postconviction court ultimately excluded Turnage's testimony on two grounds. First, the postconviction court noted that it was within the court's discretion to strike Turnage's testimony because the State did not have an opportunity to complete its cross-examination of him. Second, the postconviction court determined that Turnage's waiver of his Fifth Amendment right was invalid. Therefore,

20

we must determine whether either of these grounds was a proper basis to strike Turnage's testimony.

We first consider whether the State had an opportunity to meaningfully cross-examine Turnage. The postconviction court determined, and the State argues here, that Turnage's exercise of his Fifth Amendment right against self-incrimination frustrated the State's opportunity for cross-examination. We have previously looked to the federal courts for guidance on whether a trial court abuses its discretion when it strikes a witness's prior testimony after the witness invokes the Fifth Amendment. *See State v. Spencer*, 311 Minn. 222, 228-29, 248 N.W.2d 915, 919 (1976). In *Spencer*, we recognized that "courts have made a distinction between cases where the assertion of the privilege precludes inquiry into collateral matters which bear only on the credibility of the witness and those cases in which the assertion of the privilege prevents inquiry into matters about which the witness has testified on direct examination." *Id.* at 228, 248 N.W.2d at 919 (citing *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963)).

The Eighth Circuit has also noted that if a witness—"by invoking the privilege— precludes inquiry into the details of his direct testimony so that there is a substantial danger of prejudice, the direct testimony should be stricken in whole or in part."[7] *Brierly*, 501

---

[7]    Other federal courts have reached the same conclusion. *See, e.g.*, *United States v. Wilmore*, 381 F.3d 868, 873 (9th Cir. 2004) (explaining that, as a general rule, if a witness invokes the Fifth Amendment on cross-examination, "the district court must strike the witness's direct testimony unless the refusal to answer only concerns collateral matters" and determining that the witness's testimony should have been stricken where her invocation of the privilege precluded inquiry into details of her direct testimony that were

F.2d at 1027; *see also Wilkens*, 742 F.3d at 360.  In *United States v. Doddington*, 822 F.2d 818, 822 (8th Cir. 1987), the Eighth Circuit addressed what to do with a defense witness's testimony when the witness testified favorably to the defense on direct examination and then invoked his Fifth Amendment right against self-incrimination on cross-examination without answering any of the State's questions.  The Eighth Circuit looked to the Second Circuit's reasoning in *United States v. Frank*, 520 F.2d 1287 (2d Cir.1975).

> In *Frank* a witness called to testify by a codefendant perjured himself on direct examination.  The perjured testimony was favorable to the defendant Frank.  On cross examination, the witness was confronted with evidence that contradicted what he had testified to on direct.  The witness thereafter asserted his Fifth Amendment privilege and refused to answer questions on cross examination.  The trial court struck all of the witness'[s] testimony that would have been favorable to the defendant.  The Second Circuit affirmed, stating that the witness'[s] refusal to answer proper, relevant questions on cross examination "going directly to the heart of his testimony on direct examination" caused his direct testimony to become hearsay since it was not subject to cross examination.  Thus, the trial court properly struck the witness'[s] testimony.

*Doddington*, 822 F.2d at 822.

Here, Turnage's testimony on cross-examination related to why he changed his trial testimony.  When Turnage indicated that he did not want to answer any more questions, the State made an offer of proof regarding its intent to cross-examine Turnage further about the reasons that he had changed his testimony, including bribery and threats of violence.

---

not collateral); *United States v. Brooks*, 82 F.3d 50, 54-55 (2d Cir. 1996) (holding that the district court's failure to strike a witness's direct testimony after he asserted his Fifth Amendment privilege on cross-examination was proper because the witness asserted the privilege regarding "collateral" matters, and it did not deprive the defense of the right to test the truth of the witness's direct testimony).

Such an inquiry went directly to the heart of Turnage's direct testimony, but the State was denied the opportunity to subject that testimony to cross-examination.

Ultimately, even if the postconviction court improperly struck Turnage's testimony, any error was harmless beyond a reasonable doubt because the postconviction court specifically found that Caldwell could not satisfy the second prong of the *Larrison* test regarding Turnage. Indeed, following the postconviction evidentiary hearing, both Harrison's and Brooks's trial testimony still stand, meaning that Turnage's allegedly false trial testimony, standing alone, would not have had an impact on the jury's verdict. Because the State did not have a meaningful opportunity to cross-examine Turnage, we need not decide whether Turnage's waiver of his Fifth Amendment right was knowing, voluntary, and intelligent. We therefore hold that the postconviction court did not abuse its discretion when it struck Turnage's testimony from the record.

IV.

For the foregoing reasons, we affirm the postconviction court's denial of relief.

Affirmed.

MCKEIG, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

23